1              UNITED STATES DISTRICT COURT

2                   DISTRICT OF CONNECTICUT
   - - - - - - - - - - - - - - -x
3
   USA                              :
4                                   : Case No. 3:22cr139
   v.                               :          (OAW)
5                                   :
   JACOB DEUTSCH                     :
6                                   : JANUARY 8, 2024
                                    :
7                                   :    SENTENCING
                                    :
8  - - - - - - - - - - - - - - - x

9

10

11             SENTENCING OF JACOB DEUTSCH

12

13                  450 Main Street
                  Hartford, CT 06103
14

15

16        BEFORE: THE HONORABLE OMAR A. WILLIAMS

17

18

19

20

21

22  COURT REPORTER:  Catherine Cullen
                    (914) 552-3201
23

24  Proceedings recorded by mechanical stenography, transcript
    produced by computer.
25

```
 1    APPEARANCES:

 2

 3    FOR THE PLAINTIFF:

 4    U.S. Attorney's Office
      157 Church Street, 25th floor
 5    New Haven, Connecticut 06510
      BY: HEATHER L. CHERRY
 6

 7    DOJ – USAO
      450 Main Street, Room 328
 8    Hartford, CT  06103
      BY:  SARAH MICHELLE GRUBER
 9

10

11    FOR THE DEFENDANT:

12    CHIESA, SHAHINIAN & GIANTOMASI, P.C.
      105 Eisenhower Parkway
13    Roseland, New Jersey 07068
      BY:  LEE VARTAN
14    BY:  MELISSA F. WERNICK

15
      McCARTER & ENGLISH
16    185 Asylum Street
      Hartford, Connecticut 06103
17    BY:  DAVID X. SULLIVAN

18    EUGENE J. RICCIO
      2000 Post Road, Suite 203
19    Fairfield, Connecticut 06824

20

21    Also present:  Kelly Gandolfi, Officer Leone
                     U.S. Probation Office
22

23                      Special Agent Joseph DellaPenna

24

25
```

1            COURTROOM DEPUTY:  (Opens the courtroom).

2            THE COURT:  That you everyone, you may have a

3    seat.  Good morning.

4            MR. VARTAN:  Good morning.

5            MS. GRUBER:  Good morning.

6            THE COURT:  All right.  We are here for

7    sentencing in the United States versus Jacob Deutsch,

8    Docket No. 22cr139.

9            I'm glad everyone made it in safely today after

10   the weekend snow.

11           Would the parties please identify themselves for

12   the record.

13           MS. GRUBER:  Good morning, Your Honor.

14   Assistant United States Attorney Sarah Gruber for the

15   government.  And with me at counsel's table is AUSA

16   Heather Cherry and Special Agent Joseph DellaPenna from

17   FHFA-OIG, Federal Housing Finance Agency.

18           MR. VARTAN:  Good morning, Your Honor.  Lee

19   Vartan on behalf of Jacob Deutsch who will soon be

20   standing.  He's to my left.

21           MS. WERNICK:  Good morning, Your Honor.  Melissa

22   Wernick on behalf of Mr.~Deutsch.

23           MR. SULLIVAN:  Good morning, Your Honor.  David

24   Sullivan from McCarter & English on behalf of Mr.~Deutsch.

25           MR. RICCIO:  Eugene Riccio for Mr.~Deutsch as

1    well.

2           THE COURT:  Thank you so much.  Good morning to

3    all of you.  We also have probation here.

4           PROBATION OFFICER:  Good morning, Your Honor.

5    United States Probation Officer, Kelly Gandolfi.

6           THE COURT:  Thank you for being here on short

7    notice.  I'll note that Officer Leone was going to be

8    delayed this morning due to unforeseen reasons that were

9    brought to the Court's attention in a timely manner, but

10   Officer Leone arranged for coverage, so I thank you

11   Officer Gandolfi for joining us on such short notice and I

12   thank Officer Leone for arranging such coverage and

13   communicating it in a timely manner.

14          The Court similarly appreciates the detailed

15   presentence report which was amended several times and for

16   that reason the Court expresses great appreciation for

17   those efforts in providing the Court with all necessary

18   information to allow it to prepare for sentencing.

19          The Court took additional time even this morning

20   going through those materials one last time which was the

21   reason for the Court's delay, so thank you all for your

22   patience there.

23          The defense repeatedly updated the Court through

24   the docket updating the materials as recently as Friday as

25   to its 2473-page sentencing memorandum which caused

1    probation to then amend the PSR again on the last business

2    day before sentencing.

3         Then probation also received a letter as

4    recently as Sunday night after 8:30 P.M. which also was

5    forwarded to the Court last night.  Those efforts from

6    probation throughout this course really have allowed the

7    Court to have ample time to consider an appropriate

8    sentencing in this case ever since the plea was entered

9    some 18 months ago.  So the Court thanks probation for

10   that.

11        And Officer Leone was expected to be present for

12   Mr. Aaron Deutsch this afternoon, so I'll reiterate those

13   comments at that time as well.

14        My law clerk is attorney Phil Kim, courtroom

15   deputy is Frances Velez and court reporter is Kate Cullen.

16   As always, I ask that they speak up if anything is

17   misstated or left out or needs to be repeated, and the

18   same goes for each counsel and for Mr.~Deutsch today as

19   well.

20        In this case, on July 12th, 2022, the defendant,

21   Jacob Deutsch, pleaded guilty to conspiracy to commit mail

22   and wire fraud in violation of Section 1343 of Title 18 of

23   the United States Code by way of the Conspiracy Statute,

24   18 U.S.C. Section 1349.

25        His statutory exposure is up to 30 years in jail

```
 1    with up to five years of supervised release following any

 2    prison sentence and up to $1 million in fines.

 3            Do the parties agree to that procedural history

 4    and the statutory exposure?

 5            MS. GRUBER:  Yes, Your Honor.  Thank you.

 6            MR. VARTAN:  We do, Judge.

 7            THE COURT:  Is there any seized property for

 8    which the government seeks forfeiture in this case?

 9            MS. GRUBER:  No, Your Honor.

10            THE COURT:  The Court has reviewed the filings

11    by the parties, including all supplements, all

12    attachments, the several letters that were provided, as

13    well as the presentence report from probation and each of

14    its addenda.

15            Have the parties had ample time to review the

16    presentence report in this case?

17            MS. GRUBER:  Yes, Your Honor.

18            MR. VARTAN:  We have, Judge.

19            THE COURT:  And defense counsel has discussed it

20    with Mr.~Deutsch?

21            MR. VARTAN:  We have, Judge.

22            THE COURT:  Mr.~Deutsch, have you had time to go

23    over that presentence report with your lawyers?

24            THE DEFENDANT:  Yes.

25            THE COURT:  And do you understand what the
```

1    presence report, the information that is contained in

2    the presentence report, do you understand that, sir?

3              THE DEFENDANT:  Yes, Your Honor.

4              THE COURT:  Thank you, very much.  At this

5    point, does either party have any remaining corrections or

6    objections that you wish to put on the record asking the

7    Court to order further revisions of the PSR before I hear

8    from you as to sentencing?

9              MS. GRUBER:  Your Honor, there's one

10   clarification as to the loss amount.  As of Friday

11   afternoon, the last time we emailed probation, we had a

12   different loss amount, that there was a typo.  And so we

13   have determined that there's the unpaid principal balance

14   of 194 Washington Street, so far as I know, is

15   $10,725,642.84.  Subtracting that number from the tax

16   assessed value as it is accurately stated in the PSR would

17   give a presumed loss number of $2,722,742.80 with one

18   caveat.  That unpaid principal balance number does not

19   include a mortgage payment that may have occurred on

20   Friday.  So if Friday's mortgage payment is applied,

21   there's a different loss amount that is slightly less, but

22   it does not change the guidelines range in any way.  I'm

23   happy to provide that number to the Court if you would

24   like it.

25             THE COURT:  Just to make sure we have it, so the

 1    unpaid principal of 194 Washington Street, the government

 2    asserts, you said $10,725,642.84?

 3              MS. GRUBER:  Yes, Your Honor.

 4              THE COURT:  Thank you.  Any other corrections or

 5    objections from the government?

 6              MS. GRUBER:  Not from the government.  Thank

 7    you.

 8              THE COURT:  And the defense?

 9              MR. VARTAN:  No, Your Honor.  But I would note

10    that we sent a letter to probation on Friday morning.

11    There was no response to that from Officer Leone.  It did

12    include the number of letters that were part of our

13    supplemental submission and also supplemental argument

14    around loss.  I just want to note that for the record and

15    be sure both probation and the Court had seen that letter.

16              THE COURT:  Thank you.  Does the government want

17    to be heard on that?

18              MS. GRUBER:  No, Your Honor.  Thank you.

19              THE COURT:  Thank you.  The Court has received

20    all necessary materials and thanks defense for flagging

21    that.

22              MR. VARTAN:  Thank you, Judge.

23              THE COURT:  All right.  Then with that, and we

24    will address the guidelines in just a moment, but as far

25    as the facts as reported, the Court adopts the facts in

1    the PSR, accepting the signed plea agreement that was

2    filed on July 12, 2022 at Docket No. 48, finding that it

3    adequately reflects the seriousness of the offense

4    behavior and that accepting it will not undermine the

5    purposes of sentencing.

6           The Court also notes that it will impose a

7    sentence no greater than is necessary and it considers the

8    sentencing goals set forth in 3553A of Title 18 of the

9    United States Code.

10          It also will consider the federal sentencing

11   guidelines recommended in this case even though the Court

12   has discretion to stray from those guidelines.

13          And moving to the guidelines themselves, we can

14   go part by part, just to state that I'll quickly start by

15   noting that the parties and probation appear to agree that

16   the base offense level is 7 under Section 2E1.1(a)(1); is

17   that true?

18          MS. GRUBER:  Yes, Your Honor.

19          MR. VARTAN:  Correct, Your Honor.

20          THE COURT:  The parties also agree defendant is

21   subject to a four-point increase under 3B1.1(a) because

22   Jacob Deutsch was an organizer or leader of certain

23   criminal activity that involved five or more persons.  Do

24   the parties agree to that?

25          MS. GRUBER:  Yes, Your Honor.

1           MR. VARTAN:  We do, Judge.

2           THE COURT:  So that gets us to a subtotal of 11

3    for the offense level.  Acceptance warrants a two-point

4    decrease under 3E1.1A getting us to a subtotal of 9.  Do

5    the parties agree to that?

6           MR. VARTAN:  Yes, Your Honor.

7           MS. GRUBER:  Yes, Your Honor, depending on

8    whether other enhancements apply.

9           THE COURT:  Thank you.  As far as, so now we get

10   to the sophisticated means analysis of Section 2B1.1B10C.

11   And in considering that, the Court has considered the

12   government's briefing and paragraph 33 of the PSR.

13          Does the defense wish to be heard in response to

14   that request for a finding of sophisticated meaning?

15          MR. VARTAN:  Just briefly, Judge.  May I

16   approach?

17          THE COURT:  Of course.

18          MR. VARTAN:  I traveled from New Jersey, so I

19   have a laptop and the binder.

20          So, Your Honor, in brief, our position is really

21   just consistency between Jacob Deutsch and his codefendant

22   Aron Deutsch.  And in the case of Aron Deutsch, the

23   government did not apply the sophisticated means

24   enhancement.

25          I want to start with the language of the

1    enhancement and then refer Your Honor to the government's

2    submission to explain why we think that the government was

3    right with respect to Aaron and wrong with respect to

4    Jacob.

5         So, first of all, Judge, the language of the

6    sophisticated means enhancement is, and I'm quoting, the

7    offense otherwise involved sophisticated means and the

8    defendant intentionally engaged in or caused the conduct

9    constituting sophisticated means increased by two levels.

10        So there are two prongs.  There has to be both

11   sophisticated means or conduct and the defendant has to

12   have intentionally engaged in or caused that conduct.  And

13   so I want to refer you, Judge, to the government's brief,

14   the government sentencing brief, at page 22 if I could.

15             THE COURT:  Page 22?

16             MR. VARTAN:  Of the government's sentencing

17   submission.

18             THE COURT:  Just one second.

19             MR. VARTAN:  So I'm going to direct the Court's

20   attention in particular to the first full paragraph

21   beginning, taken as a whole.

22             THE COURT:  Okay.

23             MR. VARTAN:  So taken as a whole and the

24   paragraph continues.  It lays out what the government

25   believes is a sophisticated conduct or sophisticated means

1    here.  So, specifically, they say that Jacob emailed

2    victim financial institutions doctored or false versions

3    of hundreds of documents.

4            And then they name fake tenant leases, fake rent

5    rolls, and a number of other documents.  They go on to say

6    BHPM employees were ordered to stage empty apartments,

7    pretend to be the fake tenants and to purchase a burner

8    phone, and creating email accounts in the name of a fake

9    tenant all to fool bank inspectors.

10           Judge, if you go a few pages before to that

11   sentencing submission at page five, the government

12   excerpts one of those false leases.  It's signed by Aron

13   Deutsch, very clearly.

14           If you read Mr.~Deutsch's plea agreement and we

15   don't need to go through it with the Court, but it makes

16   very clear that Mr.~Deutsch, Aron Deutsch, caused and

17   engaged in this same sort of behavior?

18       And we read through the discovery that was provided

19   by the government in this case, and the individual who was

20   helping stage apartments and encouraging employees to go

21   and purchase burner phones was Aron Deutsch.

22       So I'm not looking to in any way to besmirch Aron

23   Deutsch or point a finger at him, all we are saying here

24   is that the government got it right with respect to Aron

25   and wrong with respect to Jacob.

1          It's the same conduct, Judge Williams, that both

2     individuals engaged in, but they are only applying the

3     sophisticated means to one and not the other.

4               THE COURT:  To cut you off for one second,

5     counsel.  The defense is not arguing that the present

6     defendant, Jacob Deutsch, did not engage in those.

7               MR. VARTAN:  No.  And to be absolutely clear

8     about that, we accept that the conduct put forward in that

9     paragraph on page 22 is conduct that we engaged in.  It's

10    also very clearly from the plea agreement and from the

11    government's own discovery, conduct that Aron Deutsch

12    engaged in.  The same conduct for both.  They were 50/50

13    partners in this business.  I don't think anyone disputes

14    that.

15         So at the end of the day, it's clear that both

16    men engaged in or caused this conduct.  It's equally clear

17    that both men are receiving roll enhancements in the

18    offense.  Jacob, a four-point enhancement.  Aaron, a

19    three-point enhancement.  So they both engaged in this

20    conduct.  It's the same conduct for both.

21         And the government is taking the position with

22    respect to Aaron that it's not sophisticated, meaning the

23    only conclusion you can draw giving the clear language of

24    the enhancement is that they must not believe this is

25    sophisticated conduct.  So if it's not sophisticated for

1   Aron, it can't be for Jacob.  That's really the argument

2   in a nutshell.

3          I would say that it's just not correct, it's not

4   a correct application of the guidelines in the same case,

5   and mind you, both of these individuals were charged in

6   the same criminal complaint, for the government to take

7   inconsistent positions, but that's exactly what happened

8   here.

9          So I don't need to say much more than the

10  conduct is the same, both individuals were 50/50 partners,

11  both individuals are receiving role enhancements.  But the

12  sophisticated means enhancement is applying only to one

13  and not the other, and that's simply an impermissible

14  reading of the sophisticated means provision and really an

15  impermissible use of the government's discretion.

16          THE COURT:  Parity is important and it's

17  something that the Court finds important, but does the

18  government retain the discretion to decide whether to

19  pursue this enhancement as to Aron Deutsch?

20          MR. VARTAN:  Yes.  But at the end of the day the

21  conduct is the same.  So the point that I'm trying to make

22  is that in Aron Deutsch' plea agreement, in this paragraph

23  in the government's discovery there's no question that

24  Aron Deutsch engaged in the conduct in this particular

25  paragraph.  I don't think there's any dispute around that.

1          They are calling this conduct, Judge,

2    sophisticated with respect to Jacob.  But it's the same

3    conduct that Aaron engaged in.  So my point very simply

4    is, we don't run from the fact, and Jacob will address the

5    Court directly, that we engaged in these criminal acts.  I

6    don't want to minimize in any way.  But we are saying this

7    was a joint effort between two men, Jacob and Aron

8    Deutsch, the conduct is the same.  Aron Deutsch admitted

9    to a role enhancement in his plea agreement and admitted

10   to the language in the plea agreement to causing this very

11   conduct, meaning he's echoing the words of the

12   sophisticated means enhancement.

13          So if he's causing the conduct and the

14   government is saying it's not sophisticated for Aron

15   Deutsch, well, Jacob caused the conduct too, but then why

16   is the conduct sophisticated for Jacob.

17          THE COURT:  So is the defense's position that

18   across the board the entirety of Jacob Deutsch's

19   misconduct is equal to the misconduct of Aron Deutsch?

20          MR. VARTAN:  The defense's position is simply

21   that the conduct is the same for both men.  And if it's

22   sophisticated -- if it's not sophisticated with respect to

23   Aaron, then that same position applies with respect to

24   Jacob.  It's really no more complicated an argument from

25   our perspective than that.

1          The government took one position with respect to

2    the same conduct that was right in the case of Aron

3    Deutsch and took another position with the same conduct

4    that we believe was wrong with respect to Jacob Deutsch.

5          THE COURT:  Thank you, counsel.

6          MR. VARTAN:  Thank you, Judge.

7          THE COURT:  Does the government wish to respond?

8          MS. GRUBER:  Yes, briefly, Your Honor.  Thank

9    you.  We understand that the Court has carefully read our

10   sentencing submission and we rely on it.  It contains all

11   our arguments relating to this.

12         I want to note, it doesn't appear the defendant

13   contests that the conduct was sophisticated, and that's

14   the key here.  We are at the sentencing of Jacob Deutsch

15   and he's admitted to the conduct, which is not a garden

16   variety fraud, this is a very complex mortgage fraud

17   involving hundreds of emails, hundreds of doctored

18   documents, and in a case where the mortgage fraud involved

19   the submission of emails to many lenders, the emails came

20   from this defendant.

21         We believe that the conduct is not the same.

22   The plea agreements are not identical.  And we also

23   believe it's within the government's discretion to view

24   each defendant separately.  We believe that complying with

25   the spirit and purpose of the sentencing guideline

1    amendments causes this result here, and for that reason we

2    believe that the sophisticated means enhancement does

3    apply in this case.  Thank you.

4            THE COURT:  Thank you, very much.  Anything

5    further from defense?

6            MR. VARTAN:  No, Your Honor.

7            THE COURT:  Thank you.  The Court has carefully

8    considered the arguments from the parties as well as the

9    arguments that were presented on the briefs, and the Court

10   reiterates that it considered paragraph 33, I believe it

11   was, of the PSR which dealt with this issue.

12           The Court carefully looked at the sentencing

13   guidelines as well and as a result the Court finds that

14   the level and extent of premeditated deception here,

15   together with the materials that were mentioned by the

16   Court warrant a sophisticated means increase of two

17   points.

18           So the Court does apply the two-point increase

19   for sophisticated means, which gets us now to a subtotal

20   of 11, though the Court mentions, again, that it does not

21   have to follow the guidelines as recommended.

22           Was my math wrong?  I have that we started with

23   a seven.  We had a four-point increase for being an

24   organizer, which got us to 11.  We had a two-point

25   decrease for accepting responsibility, which got us to

```
 1    nine.  And I thought --
 2              MS. GRUBER:  If I may?  The sophisticated means
 3    enhancement, I think some of this depends on what the loss
 4    determination is.  But if the resulting offense level is
 5    less than 12, then the sophisticated means enhancement
 6    would increase to a level 12.  In other words, there's a
 7    floor of 12.  All of this depends on the loss
 8    determination.
 9              THE COURT:  Thank you.  Does the defense want to
10    be heard on that?
11              MR. VARTAN:  No.  That's an accurate reading of
12    the guidelines.
13              THE COURT:  The Court appreciates that
14    correction.  That is correct.  So, I'm sorry, that does
15    take us up to 12.
16              I thank the government for that point and the
17    defense for the concession there.
18              Now, that does bring us to loss, actually, at
19    this point.  It looks as though the defense is arguing
20    that the actual loss in this case is zero; is that
21    correct?
22              MR. VARTAN:  Correct, Your Honor.
23              THE COURT:  Does the government, based on the
24    most recent filings, does the government dispute that the
25    actual loss should be zero?  And if so, would you like to
```

1    be heard on that?

2          MS. GRUBER:  Yes, Your Honor.  The government

3    understands that the Court has to find the correct

4    guidelines first before imposing a sentence, whether that

5    sentence falls within the guidelines range or not.

6          And so it's the government's position that

7    according to application of the guidelines, the Court

8    should find the presumptive loss amount as set forth in

9    application 3E of 2B1.1.  That application note was agreed

10   to by the defendants, by defendant Jacob Deutsch in his

11   plea agreement, and it provides a calculus to at least

12   determine a presumed loss amount, which is a rebuttal

13   presumption of the loss.

14         And so it's the government's position that the

15   Court should find that number and then decide whether that

16   number has been rebutted here.

17         THE COURT:  What is the figure that the

18   government is urging at this point?

19         MS. GRUBER:  Based on the most recent

20   information as of Friday evening, the government believes

21   the Court should find that the most recent tax assessed

22   value of 194 Washington Street is $8,002,900.  And then

23   from that number based on application of the application

24   note 3E, you would subtract the unpaid principal balance

25   of that mortgage.  And so that's the number I provided to

1    the Court this morning.  That is the $10,725,642.84.  And

2    when you subtract that number, you are provided with a

3    presumptive actual loss of $2,722,742.80.

4              So, Your Honor, we believe the Court should

5    consider those numbers and then decide whether the

6    defendants have rebutted that presumption.

7              Now the government's position here is not to

8    attempt to get the defendants on a technicality.  We

9    understand that the building may be sold.  But Your Honor

10   remembers, the building was going to be sold many times

11   over a period of years.  And so our argument is also as it

12   relates to the government's ultimate sentencing

13   recommendation, is that the appropriate sentence is

14   untethered to this loss amount.  The conduct is

15   sufficiently serious to warrant a significant term of

16   incarceration regardless of what the loss ends up being.

17             We have concerns with representations about the

18   business -- I'm sorry, the building selling, because we

19   have heard those before and we are not sure why they have

20   not sold.  We don't know a lot of information about that

21   marketing and sale process.  And so if defense counsel

22   will get up and explain that to the Court, we will

23   certainly defer to the Court about its determination on

24   the loss amount by application of the guidelines.

25             But at this point, the government can only look

1    at today's date, which is when the loss determination is

2    to be made, and does not understand the building to have

3    been sold, and so the government merely proffers that

4    presumptive loss amount and defers to the Court's

5    determination.

6                THE COURT:  Thank you, counsel.  Based on the

7    government's request with respect to the presumptive loss

8    followed by argument on whether it's been rebutted, does

9    the defense take a position on that?

10               MR. VARTAN:  We do, Judge.  And I want to note

11   for the record, because the loss determination obviously

12   impacts Aron Deutsch as well, that both Mr. Twardy and

13   Ms. Necheles are in the gallery and they are prepared to

14   join in the arguments, whatever Your Honor decides,

15   presumably it will be binding on Mr. Aaron Deutsch.  So I

16   just wanted to note that in case I miss anything.

17               Let me start first, and I'll address of course

18   the government's overall position when we hit upon the

19   3553A factors.  But let me first start by thanking you,

20   Judge Williams, because all of the attorneys at the table

21   and all of the attorneys behind me understand how atypical

22   it is for a plea to happen in July of 2022 and a

23   sentencing to happen in January of 2024.  And we know that

24   Your Honor gave us the space between plea and sentencing

25   to sell all 24 buildings that were listed in the plea

1    agreement.  So I just wanted to thank you for that on

2    behalf of Jacob Deutsch and everyone at the table here,

3    because again, we do know that it is incredibly atypical.

4          THE COURT:  You're welcome.  The Court did note

5    on the docket the reason for doing so and the limits to

6    those extensions.

7          MR. VARTAN:  And we certainly understand and

8    appreciate those limits.  But we are here to tell you, and

9    hopefully it came across in the supplemental sentencing

10   submission, that we made good use of each and every minute

11   between July of 2022 and January 8th of 2024.

12         As Your Honor notes from this submission, all

13   but one building at this point that could impact loss, all

14   but one had been sold, and that is 194 Washington Street.

15   But we are in, Your Honor, so atypical a situation,

16   certainly not one that I think is contemplated by the

17   guidelines or would ever be routinely contemplated by the

18   guidelines.

19         Because coming into this courtroom today, and

20   the Deutsch's real estate attorney, Judge, is with us in

21   Court, Bruce Temkin, who is prepared to address the Court

22   and answer any questions Your Honor may have.  But coming

23   into Court today, the first question I had when I ran past

24   my client to Ms. Temkin was to ask, is there any update.

25   Because literally, Judge, 194 Washington Street could

1    close at any moment.  It could close while we are in

2    Court.  It could close tomorrow.  And I understand and

3    appreciate that the government has some questions about

4    why did it take so long, but I think it's also

5    self-evident.  And I'm not a real estate attorney and I

6    don't know much about the Hartford real estate market

7    beyond this case, but I think it's self-evident as to why.

8    We are talking about 24 buildings in a small city and we

9    began this process, mind you, in the Fall of 2021, Judge.

10   And since then, interest rates have gone up, the market

11   has not in any way improved, so this is an incredibly

12   difficult market as we tried to make clear in the

13   declaration from Taylor Perun who is the Deutsch's real

14   estate broker.

15          So the reason that this didn't happen sooner had

16   nothing to do at all with Jacob Deutsch, nothing at all to

17   do with Aron Deutsch.  It had to do with real buyer side

18   issues as detailed in the Perron declaration.  But there's

19   not much reason to tally or delay on the ultimate question

20   here, because coming into Court there's a signed contract

21   that is imminently going to close.  And the purchase price

22   for 194 Washington Street, Judge, is $15.5 million.  So

23   respectively to the Court and also to the government's

24   position, I don't really understand how anyone with a

25   straight face would say that at 10:50 on a Monday there's

1    a $2.7 million loss, but tomorrow at the same time if

2    everything I understand from Mr. Temkin is accurate, is

3    true, when the property closes there is no loss; really

4    just defies, to me, commonsense.

5         We are coming in here today with a signed

6    contract that could close today that far exceeds the

7    unpaid principal mortgage balance on 194 Washington

8    Street.  It's clear to me that there's no loss.

9         The other point I would make, and again I would

10   invite Mr. Temkin --

11        THE COURT:  If I pause for one moment, counsel,

12   to the government's point.  We have been near sales

13   before.  So if this sale doesn't go through and doesn't

14   close, is the defense's position that we should still be

15   at zero for the actual loss?

16        MR. VARTAN:  It would be because the presumption

17   is rebuttable as the government acknowledged.  And there

18   are two ways that we rebut that presumption at this point.

19        So the first one, Judge, is the actual contract

20   itself that has a purchase price of 15 and a half million

21   dollars.  And I don't have the buyer's appraisal or

22   information from the buyer, but presumably there would be

23   no approval from the bank or the buyer for that matter if

24   15 and a half million dollars was not the actual value of

25   the building.

1          Beyond that, Judge, I would point Your Honor to

2    the fact that we have sold at this point many properties.

3    I believe 20 plus properties or close to 20 properties at

4    this point.  All of those properties sold far in excess of

5    the tax assessed value.

6          So we have now a real track record in this case

7    where the tax assessed value is one thing and the sale

8    price of the property is far in excess of that.  And I

9    understand that there again is some question about, well,

10   when is this going to happen.  But that's why Mr. Temkin

11   filed a letter with the Court on January 4th and why he's

12   here present in the courtroom with me.  He's prepared to

13   address any of Your Honor's questions.  But he in a

14   nutshell told me that the only thing preventing 194

15   Washington Street from closing at this point are just the

16   normal things that delay a closing.  So there's no

17   question in his mind, and I don't mean to speak for him,

18   he's here, there's no question in his mind this property

19   is going to close imminently.

20         We have appraisals that are far in excess of the

21   mortgage balance, and a history of selling multiple

22   properties, so when you couple all of that together,

23   Judge, we believe we rebutted the presumption and then

24   some.

25         I don't know and I don't mean to be

1    presumptuous, I don't know if Mr. Twardy or Ms. Necheles

2    wanted to add anything.

3         THE COURT:  First, I'll ask, do you want to

4    check and determine whether they wish to be heard?  And

5    I'll hear from the government if they object.

6         MR. VARTAN:  The only other thing that I would

7    add on behalf of both Deutsches is the fact that this note

8    or commentary is obviously applicable across the nation.

9    And I think that we have an appreciation here on the East

10   Coast, New York, New Jersey, Connecticut, that tax

11   assessed value really doesn't track to a property's actual

12   value.  I think that's almost just common knowledge for

13   anyone who owns an apartment or a home in the tristate

14   area, so I'll put that on the record as well.

15        THE COURT:  Do you want to check and determine

16   whether anyone wants to be heard?

17        First, does the government object?

18        MS. GRUBER:  No, Your Honor.

19        MS. NECHELES:  Susan Necheles for Aron Deutsch.

20   The only other thing I would add, there's a hard deposit,

21   money that the buyers will lose on this transaction if it

22   doesn't go forward.  There's no reason not to believe that

23   this sale will take place.  It may take place today before

24   the next sentencing, and it would be very strange for

25   there to be two different amounts of loss here.  Thank

1    you.

2            MR. VARTAN:  And, Judge, thank you.  Thank you,

3    Ms. Necheles.  The only thing I would add to that is from

4    the contract, the deposit that is hard is $630,000, so

5    this is in no way insignificant.

6            THE COURT:  Okay.  Based on the defense's

7    argument that the loss has been rebutted, together with

8    the arguments from Attorney Necheles, does the government

9    wish to be heard further?

10            MS. GRUBER:  Just briefly, Your Honor.  Thank

11    you.  This is a challenging case, Your Honor.  And the

12    government's position is that the guidelines strike the

13    appropriate balance in a case where market pressures can

14    swing at any moment.  The very harm that could result from

15    mortgage fraud is something that is very hard to determine

16    until the bad thing happens.

17            We have a lot of questions about why it took so

18    long, why some buyers backed out of purchasing 194

19    Washington Street.  But be that as it may, the Court has

20    the information presented by defense counsel and we defer

21    to the Court's determination on the risk here.  Thank you.

22            THE COURT:  Thank you, counsel.  The Court --

23    does anyone want to be heard further on this issue?

24            MR. VARTAN:  Just the last comment I would make,

25    the risk, Judge, to piggyback off the government's last

1    comment, is really at this point zero.  As I think that we

2    have made clear in our submissions to the Court, the

3    purchase price, the fact that $630,000 is already

4    committed to this project and the fact that Mr. Temkin is

5    prepared to address any of Your Honor's questions about

6    why there has been delay.

7            THE COURT:  Based on the arguments that I have

8    heard, the briefing from the parties and the arguments

9    here in Court, the Court does make the finding of

10   presumptive loss requested by the government for the

11   reasons that were argued by the government.

12           However, the Court immediately thereafter makes

13   a finding that on the circumstances in which we find

14   ourselves, specifically the purchase price that was noted,

15   the hard deposit that was mentioned, and as counsel has

16   argued the track record of previous sales in this case, in

17   particular the details of each of those sales, all of

18   those matters taken together, along with Attorney

19   Necheles' comments regarding the potential for a disparate

20   finding as to Aron Deutsch at 2:00 p.m. in just a few

21   hours, and also acknowledging that the Court still retains

22   a discretion to stray from the guidelines recommendations,

23   for all of those reasons the Court does find that the

24   presumptive loss has been rebutted by the defense and that

25   the loss is determined to be zero in this case.

1          And based on that and our current level

2    remaining at 12 at this point, does the government wish to

3    be heard beyond its briefed materials regarding any

4    intended or other loss at this time?

5          MS. GRUBER:  No, Your Honor.

6          THE COURT:  Thank you.  Does defense want to be

7    heard on any of those arguments?

8          MR. VARTAN:  No, Your Honor.

9          THE COURT:  Thank you.  Based on the briefing

10   and based on the findings just made by the Court, the

11   Court also declines to make a finding of intended loss for

12   purposes of assessing what the guidelines recommend.

13          So moving on to Amendment A21, do the parties

14   agree Mr.~Deutsch qualifies for the two-level decrease as

15   a zero-point offender under Section 4C1.1 of the

16   guidelines at this time?

17          MS. GRUBER:  Your Honor, the government believes

18   that decrease is not applicable here.  We believe that

19   Officer Leone made that updated recommendation in his

20   fifth addendum to the PSR, and I'm happy to provide case

21   law if the Court wishes.

22          And for the Court's clarification, the

23   government's position is that decrease does not apply

24   because Mr.~Deutsch has been sentenced to, or the

25   guidelines give him an aggravated role enhancement.  And

1    so under B10 of that provision, he is disqualified from

2    the zero-point offender decrease.

3            THE COURT:  Okay.  So it's because of the

4    aggravated role in the present case?

5            MS. GRUBER:  Yes, Your Honor.

6            THE COURT:  Does defense want to be heard?

7            MR. VARTAN:  We believe that's correct.

8            THE COURT:  Okay.  So based on that, the

9    two-level decrease does not apply, leaving us with 12.

10   But the defense, there was a final issue on the

11   guidelines, the defense was requesting a finding of

12   extraordinary rehabilitation under Section 5K2.0(d).

13           Does the government want to be heard in

14   opposition to that finding of extraordinary

15   rehabilitation?

16           MS. GRUBER:  Yes, Your Honor, just briefly.  We

17   rely on our sentencing submission as to that point.  But

18   the long and short of it is that the defendant's efforts

19   during the past year-and-a-half, and actually almost

20   two-and-a-half years since he was first arrested, were not

21   extraordinary in the government's position.  We believe

22   that they were calculated to present a better sentencing

23   outcome as it relates to the guidelines.

24           But to the extent that surely the defendant's

25   spent effort to market and sell the properties, they are

1   in the real estate business; they went to work like they

2   always did.  And any difficulties attending to selling the

3   buildings to obtain a better guidelines range, any

4   difficulties were because of market conditions and that's

5   something that they needed to bear given the type of fraud

6   that they committed.

7          And so the government's position is just that

8   nothing was extraordinary about this.  The cases cited by

9   the defendant show efforts far beyond what happened in

10  this case, and to the extent that there were efforts here,

11  and those efforts resulted in a large dollar value, that's

12  because their fraud was for millions and millions and

13  millions of dollar's worth of loans that they should have

14  not have obtained.  Thank you.

15         THE COURT:  Thank you, counsel.  The Court went

16  to review the defense arguments for extraordinary

17  rehabilitation starting at page 10 of its brief, docketed

18  at Docket Entry 74.

19         Before hearing from the defense again, does the

20  defense wish to be heard on this issue?

21         MR. VARTAN:  Briefly.  If I may approach, I want

22  to provide information I provided to the government

23  earlier.

24         THE COURT:  Sure.

25         MR. VARTAN:  So, Judge, what I just handed up to

1    Your Honor is something that we prepared over the weekend.

2    As Your Honor noted, we have been working right up to the

3    end, because the buildings have been selling to the very

4    end.

5         This is a listing of every building that was

6    included in the plea agreement, except for 50 Gillett

7    Street and 17 Marshall Street which are also going to

8    close with 194 Washington Street.  The only reason for

9    that is we didn't have up-to-date information for those

10   two properties.

11        So if you look at the original principal column,

12   that shows the original loan amount for each of those

13   buildings.  If you go to the next column, cumulative

14   interest paid, this is the amount of money that Jacob and

15   Aron Deutsch, BHPM, paid to each of the lenders from loan

16   inception through the sale of the building.  $7.2 million.

17        I'll pause there for a moment, because one of

18   the things that I should have said earlier that I didn't

19   with respect to loss, is that at no point in seven years,

20   and this includes during the heart of the COVID-19

21   pandemic, did BHPM miss a single mortgage payment.  And

22   you heard even the government note on the record with

23   respect to 194 Washington Street, which is imminently

24   being sold, that there was a mortgage payment that was

25   paid as recently as Friday.  So $7.2 million in interest

1    from the beginning of BHPM's relationship with these

2    lenders through present.

3            THE COURT:  To the extent you mention the

4    pandemic, during the worst of the pandemic, the defendant

5    was also misrepresenting certain residences as being

6    occupied, correct?

7            MR. VARTAN:  There's no question that the

8    behavior here, and better to hear it from Mr.~Deutsch than

9    me, but there's no questions, Judge Williams, that the

10   behavior here is significant.  It is serious.  We don't

11   run from that.  We have never run from that.

12           THE COURT:  I won't skip through all of the

13   seriousness of the criminal conduct.  But why should the

14   efforts from which the defendant has benefited greatly,

15   even in the Court's findings as to loss, why does this set

16   of efforts within that greater context justify a finding

17   of extraordinary rehabilitation?  Why is this

18   extraordinary?

19           MR. VARTAN:  It's extraordinary for a few

20   different reasons.  And just to round out this chart, the

21   fact of the matter is, that in addition to the interest

22   that was paid there were also $1.6 million in prepayment

23   penalties that Jacob and Aron Deutsch paid to the banks in

24   order to close these buildings.

25           THE COURT:  But that was triggered by his

1  criminal conduct, which was triggered by his arrest, and

2  his interest in putting himself in the best possible light

3  pending sentencing.

4          MR. VARTAN:  Of course, yes, he wants to come to

5  the Court and be in the best possible light.  But that's

6  why a piece of the supplemental sentencing submission,

7  Judge, is so important.  Because we all agree, the

8  government agrees, that to the extent the assessed value

9  exceeds the unpaid principal balance of the mortgage,

10  there's no loss.

11          THE COURT:  Sure.

12          MR. VARTAN:  And so we detailed 12 of the 24

13  properties in the supplemental sentencing submission where

14  that was true.  Meaning, there was no loss even under the

15  government and probation's analysis.

16          But Jacob Deutsch sold those buildings, too.

17  Had he not, he would have still been in the same loss

18  position given what the government has put on the record.

19  But he sold the buildings, because he truly is remorseful.

20          And with respect to the extraordinary piece of

21  this, it's extraordinary for a few reasons.  The first

22  reason, Judge, is this was a two-year long effort.  This

23  desire, mission, vow to sell these buildings began in the

24  Fall of 2021 which was well before Mr.~Deutsch's change of

25  plea hearing in this case.  In fact, Judge Williams, as

1    you know, the first tranche of buildings sold in May of

2    2022 before he had even entered his guilty plea.

3         So Jacob Deutsch has been committed to this

4    mission for more than two years.  And to meet the

5    challenge or the question that the government had put

6    forward in its sentencing submission, we spoke to Taylor

7    Perun, the broker from Northeast Private Client Group who

8    worked closely with Jacob Deutsch and Aron Deutsch with

9    selling these buildings for the past two years.  And I

10   would say, respectfully, that his declaration shows why

11   this was extraordinary, why this was exceptional.  Not

12   because he uses the word exceptional, which he does in his

13   declaration, but he details the several hundred hours he

14   spent working the market to sell these buildings.  And he

15   said that the hundreds of hours he spent was matched and

16   exceeded by the hours that Jacob Deutsch spent.  Nights,

17   weekends, time away from his family and time away from his

18   friends and personal endeavors.

19        THE COURT:  Sure.  But what was the time and

20   effort expended in committing the fraud to begin with?

21        MR. VARTAN:  I can't dispute that.  They are two

22   separate inquiries.  And this is about a departure for

23   extraordinary restitution or rehabilitation, which has to

24   be assessed on its own merits.

25        THE COURT:  But is not the greater context of

1     the criminal conduct an appropriate consideration?

2              MR. VARTAN:  Certainly, an appropriate

3     consideration.  Let me come at it a little differently to

4     show why this is extraordinary, aside from the time and

5     effort.

6          So one thing that Mr. Perun said in his declaration

7     which I think is incredibly important to highlight for the

8     Court, is that Jacob Deutsch and Aron Deutsch never took

9     their foot off the gas.  And I'm quoting from his

10    declaration.  Meaning, he has 10 years of experience in

11    the Hartford multi-family market.  He said I've never seen

12    individuals, Jacob Deutsch and Aaron Deutsch, selling a

13    portfolio of buildings where they are continuing to make

14    significant capital improvements even though the buildings

15    are for sale.

16         So at no point, again the quote from him, did Jacob

17    take his foot off the gas.  And why is that significant?

18    Because Mr. Perun who is an expert in this area, whose

19    been doing it for ten years, hundreds of times, said but

20    for that, but for the investments the Deutsches had made

21    in the buildings to begin with, these buildings would not

22    have sold and we would not be at zero loss.  So that is

23    something the Court should pay close and careful attention

24    to.

25         The other reason why it's extraordinary, and I've

 1    been doing this for a while for both sides, I've never

 2    seen this, and you mention the late-breaking letter from

 3    last night.  There are four victim lenders that the

 4    government has identified in this case.  Sachem and CBRE

 5    are two of those victim lenders.

 6         On December 19 of 2023, Sachem Capital, Exhibit A in

 7    my supplemental sentencing submission, we quoted a number

 8    of times in the submission, Sachem Capital came forward

 9    with a letter and said we don't consider ourselves to be a

10    victim.

11         I've never seen something like that before.  And it

12    wasn't simply that we are not a victim because Jacob

13    Deutsch paid us.  Sachem Capital said we are not a victim

14    because at inception Jacob Deutsch came to Sachem Capital

15    and admitted what he had done wrong.  He met with the

16    officers of Sachem Capital, sat with them face-to-face and

17    said we are going to make this right.  I'm going to make

18    it right.  And he did.

19         It took two years, and again, we thank the Court for

20    its indulgence.  But he did make it right.  So Sachem

21    Capital is not saying we are not a victim because we are

22    paid in full; although again they were.  Sachem Capital is

23    saying we are not a victim because Jacob Deutsch was

24    transparent with us.

25         And again, it's not to forgive, Judge Williams, what

 1    he did before.  I can't do that.  He's not looking to

 2    avoid the criminal conduct.  But it is to say when the

 3    criminal conduct was known, he met it face-to-face.  He

 4    met it head on.  And that's why CBRE sent a letter to the

 5    Court, Judge Williams, last night.  CBRE said the same

 6    thing.

 7        So two of the four victim lenders have actually come

 8    forward in this case and spoke in support of Jacob

 9    Deutsch.  That, in my experience, is extraordinary.

10            THE COURT:  During that timeframe of the

11    defendant's efforts, counsel, did the defendant, was he at

12    the same time earning any other taxable, reportable

13    income, and if so, should that matter?

14            MR. VARTAN:  Well, there are, as the Court

15    knows, a few buildings, I believe 100 units roughly in

16    all, that are not implicated by the plea agreement at all.

17    Meaning, there are buildings that both sides acknowledge

18    were rightfully purchased by the Deutsches.

19            THE COURT:  Is this not the type of business

20    behavior in which he engages in normally?

21            MR. VARTAN:  All I'm saying is that there's a

22    subset of what happened here that is not in any way

23    implicated by the plea agreement or the government's

24    allegations.  So if the Court's question is:  Is he making

25    a salary from the work he has done around those buildings?

1   Yes, he is.  But he did not take monies from the sale of

2   the buildings, which is another reason for the extra

3   extraordinary rehabilitation or restitution departure.

4           THE COURT:  You said he didn't take money from

5   the sales of the buildings?

6           MR. VARTAN:  Involved with the plea agreement.

7           THE COURT:  Yep.

8           MR. VARTAN:  Correct.  I'll note, Judge, the

9   other extraordinary piece of this, which CBRE mentions in

10  its letter, he's coming to the Court today having paid

11  restitution in full.

12          THE COURT:  Sure.

13          MR. VARTAN:  CBRE claimed $222,000 in attorney's

14  fees across three separate law firms for being a victim of

15  BHPM's crimes.

16          THE COURT:  These are all factors the Court can

17  consider in arriving at an appropriate sentence.  But for

18  purposes of the extraordinary rehabilitation section of

19  the guidelines, does the defense have anything else to

20  argue as to why this conduct qualifies for that?

21          MR. VARTAN:  Sure.  I'll say two last things in

22  response, because I know Your Honor carefully read

23  everything submitted.

24          The first one is, I've canvassed the filings

25  from the district in advance of the sentencing.  I was

 1   unable to find any recent prosecution coming out of the

 2   District of Connecticut where the loss was zero.  I was

 3   unable to find any recent prosecution coming out of the

 4   district where the loss was zero because of the two-year

 5   long efforts of the defendant, in this case, Jacob

 6   Deutsch.

 7            THE COURT:  Well, had I denied the request to

 8   extend sentencing by a year-and-a-half from the time of

 9   plea, we wouldn't have been at zero here, correct?

10            MR. VARTAN:  True.  Although he was committed to

11   continuing --

12            THE COURT:  So were those others Courts as

13   lenient as this one?

14            MR. VARTAN:  I don't know the specifics.  I

15   couldn't say.  But I can say that just based upon the

16   collective experience of the attorneys at that table, for

17   what it's worth, we have never seen a prosecution where at

18   the end of the prosecution not only were the victims made

19   whole, but they actually profited to the tune of

20   $8.8 million.  So I'm not saying that by way of excuse or

21   a pat on the back or anything like that.  We fully

22   appreciate what Jacob Deutsch did.  He fully appreciates

23   it and understands the severity.  But it doesn't change

24   the fact that what he did to undo his crime before we got

25   here.

1    What CBRE recognized in the last sentence of its

2    letter is not the norm, not anything that I've seen

3    before.  And so when you are thinking about is this

4    extraordinary, I would pose the question to the Court,

5    which is:  What more could Jacob Deutsch have done in

6    order to undo his crimes?  Not forgiving what he did, but

7    recognizing what he did, recognizing the severity and the

8    wrongfulness, which he does.

9    What more could he have done to unwind those

10    crimes?  So that's how I think about it.  And when you

11    think about it in that way, it seems to me that his

12    two-year long effort to make sure that no lender lost

13    money which efforts were recognized by Sachem Capital,

14    which efforts were recognized by CBRE, is certainly

15    extraordinary if the departure is to have any

16    applicability.

17    THE COURT:  Thank you, counsel.

18    MR. VARTAN:  Thank you, Judge.

19    THE COURT:  Does defense wish to have this

20    marked as an exhibit?

21    MR. VARTAN:  I would mark as a D1 for the

22    record.

23    THE COURT:  Any objection?

24    MS. GRUBER:  No, Your Honor.

25    THE COURT:  So ordered.  Does the government

1    wish to be heard in response?

2            MS. GRUBER:  Very briefly, Your Honor.  The

3    government agrees that these are all great arguments for

4    the 3553 factors.  The government does not believe that

5    these efforts were extraordinary.

6            The plea agreement contemplated the sale of

7    these properties.  The defendant agreed to a special

8    condition of supervised release that would, if he's

9    involved with the buildings in the stipulation of offense

10   conduct, he'd be winding them down.

11           And the government also notes in one of the

12   cases cited by the defendant, the efforts that

13   rehabilitation or restitution of other defendants happened

14   as of the date right after arrest, and here there was

15   post-arrest conduct.  So there was not an immediate come

16   to judgment and immediate attempt to rehabilitate here.

17   That was not the case.

18           And if Your Honor has any other questions, I'd

19   be happy to answer them.

20           THE COURT:  Does defense want to be heard on

21   this issue?

22           MR. VARTAN:  No, Your Honor.  Thank you.

23           THE COURT:  The Court carefully has considered

24   the arguments of the parties here in open Court as well as

25   those filed in the briefing, and the Court certainly

1    acknowledges the efforts of this defendant, Jacob Deutsch,

2    they were considerable, whatever their motivation.  But

3    the defendant also does not come to Court without a record

4    of criminal convictions.  That's not necessary for finding

5    of this nature, but it does provide some context which, as

6    the Court noted, is important.

7          Mr.~Deutsch has gone to federal prison before

8    for criminal conduct that is not entirely distinguishable

9    from the nature of this present offense.  Additionally,

10    the Court has taken into account the defendant's efforts

11    when the Court assessed rebuttable loss.

12          So all things considered, the Court finds that

13    the defendant's efforts in this case to mitigate the

14    criminal activity that he carried out, the Court does not

15    find those efforts to be extraordinary in the manner

16    contemplated by the sentencing guidelines.  And so for

17    that reason, the defense request is denied, which leaves

18    us at a level of 12.  And I believe the parties stipulate

19    to a criminal history of 1; is that correct?

20          MR. VARTAN:  That's correct, Your Honor.

21          MS. GRUBER:  Your Honor, the government will

22    stipulate to the criminal history.  However, the

23    government believes that the resulting range is level 13.

24    And we didn't make a motion yet for acceptance of

25    responsibility.

1              THE COURT:  Sorry.

2              MS. GRUBER:  The government moves for acceptance

3    of responsibility.

4              THE COURT:  Does defense want to be heard?

5              MR. VARTAN:  No, Your Honor.

6              THE COURT:  That motion is granted.  And so this

7    is 12 to 18 months as a recommended guidelines range?

8              MS. GRUBER:  Yes, Your Honor, for Level 13, Zone

9    C.

10             THE COURT:  Does defense want to be heard on

11   that?

12             MR. VARTAN:  That's correct, Your Honor.  The

13   guidelines offense level is a 13.  So without the loss

14   being applied, sophisticated means is applied which gets

15   you to a 12 plus 4, for organizer leader, minus 3, which

16   gets you to a 13.

17             THE COURT:  Thank you.  The Court agrees with

18   that assessment.  Thank you to the parties for that

19   correction.

20             And so, at the offense level of 13, criminal

21   history score of 1, the guidelines recommended range is

22   between 12 and 18 months in jail.

23             Does either party wish to be heard any further

24   with respect to the Court's guidelines findings?

25             MS. GRUBER:  Not from the government, Your

1    Honor.

2         MR. VARTAN:  No, Your Honor.  But there was one

3    housekeeping issue which I apologize for because I know

4    I'm taking things out of order.

5         THE COURT:  Related to the guidelines?

6         MR. VARTAN:  Not really.

7         THE COURT:  Let me pause you for a moment.

8    Mr.~Deutsch, do you understand the guidelines

9    recommendation as to the sentencing range that is

10   recommended by the guidelines as found by the Court?

11        THE DEFENDANT:  Yes.

12        MR. VARTAN:  Apologies, Judge.  We have Rabbi

13   Bryski from the Aleph Institute who flew across the

14   country to be here for Mr. Deutsch and to speak on his

15   behalf.  I'm told by Rabbi Bryski that he has a plane that

16   he will need to catch sooner than anticipated, so with the

17   government's permission I was hoping he may be heard out

18   of order.

19        THE COURT:  Does the government want to be

20   heard?

21        MS. GRUBER:  No, Your Honor.

22        THE COURT:  Sure.  Just either at defense

23   counsel's table where there's a microphone and ask for

24   identification and just for the Rabbi to introduce himself

25   and spell his name for Madam Court Reporter.

1          MR. VARTAN:  We appreciate it and thank you to

2     the government.

3          RABBI BRYSKI:  Good morning.  Thank you.  Yossi,

4     Y-O-S-S-I, B-R-Y-S-K-I.  I come here representing the

5     Aleph Institute, A-L-E-P-H, and essentially I'll start

6     from the end.  I'm asking for the program that we already

7     implemented and the one that Mr.~Deutsch is doing so well

8     in, that it continue uninterrupted by any period of

9     incarceration.  I'll explain why.

10          First of all, just briefly, Your Honor already

11     read the memo, but Aleph operates and provides pro bono

12     services to people of all walks of life.  And the very

13     first thing we do is ask the individual, the defendant, to

14     subject themselves to a psych eval.  And the reason for

15     this is not to find various excuses underlying issues that

16     explain the behavior away.  We make it very clear to the

17     defendant and we make it clear to the Court that all those

18     findings are really just to identify underlying issues

19     that we can now address, that we have been addressing for

20     many months leading up to sentencing.

21          We hope to continue to do so.  We believe

22     obviously that prison is appropriate in some instances.

23     But sometimes I find that our reentry department as Aleph

24     finds it difficult to shepherd that and help people after

25     they have been released when they say I've already paid my

1   dent to society, and society tells them that.  So there's

2   very little interest on the part of that inmate to work on

3   themselves.

4           And someone who has already demonstrated over

5   this long period of time that the Court was so gracious to

6   bestow upon this defendant for various other legal reasons

7   perhaps, but I can say it's been a request of mine with

8   all defendants that in fact sentencing be deferred for as

9   long as possible.

10          There was a judge, I believe, in the Eastern

11  District of New York who would initially always give extra

12  time to sentencing and say I'm going to defer sentencing

13  for a year, let's see how you do.  In this instance it was

14  so beneficial for us to be able to assess.  I wouldn't be

15  here today to back up the memo.

16          I come only in specific cases where I truly

17  believe rehabilitation is occurring and we are in the

18  midst of that rehabilitation as we speak.  We have been

19  very successful with him.  And the community service we

20  propose is not community service.  I would like to impress

21  upon the Court that this is well thought out.  It's the

22  kind of activity that allows the individual to reflect

23  upon their behavior, to reflect upon their life.  This is

24  an elderly individual who humbly comes to classes of mine

25  on a weekly basis to study law and ethics and morals.

1    Things he's aware of, but never truly internalized.

2              I wish I would have met him many years ago, but

3    this is what it is.  And ultimately what I'm proposing as

4    an alternative to incarceration is something I believe

5    will continue to assist him and many others that he knows

6    and people that know him to proper rehabilitation and

7    deterrence.

8              I read the government memo.  I always do.  I'm

9    fully aware, although I don't understand all the nuances,

10   I'm aware of what has been going on.

11             I still believe even after what I read that this

12   individual person has engaged in restorative justice when

13   he faced the people that he had victimized.  I don't

14   believe there's such a thing as a victimless crime.  I

15   know that people have, when they come to me and say they

16   are innocent, I hang up the phone.  When they say it's a

17   victimless crime, I have a problem with that and they are

18   out of the program.  So innocent people or people who

19   plead guilty for convenience because they don't want to go

20   to trial are not part of our program.

21             I want to conclude with an anecdotal story.  A

22   rabbi in Russia would tell this to a young kid who had

23   gone off the wagon.  He said, you love racehorses, right.

24   He said, well racehorses when they go in the wrong

25   direction it's terrible that they are so fast and do so we

 1  well with their speed because they go in the wrong

 2  direction so quickly.

 3         And the kid was taken by that because he wasn't

 4  doing well.  And the rabbi reminded him, when the horse

 5  gets back on track and makes its way back to where it

 6  needs to go, it can also go extremely quickly.

 7         This individual, Mr.~Deutsch, has most

 8  definitely and humbly recognized that after all these

 9  years, a religious Jew and following the rules, and

10  behavioral discipline is there, but unfortunately it

11  didn't carry over to a lot of other areas of life, to the

12  business side of things.  And this is not a victimless

13  crime and he knows that, and he's ready to make penance

14  and ready to rehabilitate and bring things back to where

15  they need to be.

16         Thank you very much for allowing me the

17  opportunity to address the Court.

18         THE COURT:  Thank you for coming all this way to

19  present a compelling statement in addition to what was

20  provided in writing.  Thank you for that.  And especially

21  with the weather.  Thank you.

22         At this time, is there anyone else the defense

23  wishes to have the Court hear out of order?

24         MR. VARTAN:  No, Your Honor, but I appreciate

25  you asking.

1          THE COURT:  Thank you.  In a moment the Court

2    will hear from the government, I'll hear from defense

3    counsel, and if the defendant wishes to speak, I'll hear

4    from Mr.~Deutsch.  Of course, along the way if there are

5    folks either party wishes to present to the Court, you

6    will have the opportunity to do so.  I just ask you do so

7    in a similar vein, that you identify those individuals,

8    spelling their name for Madam Court Reporter, and they

9    present from counsel's table or the podium so they can

10   have a microphone.

11          Before I do that, I'll ask the government

12   whether there's anybody present on behalf of any victim

13   who wishes to be heard today?

14          MS. GRUBER:  No, Your Honor.  The government

15   notified all the victims and there's nobody here today.

16          THE COURT:  I'll canvas the courtroom.  Is there

17   anyone here as a victim of this crime who wishes to be

18   heard today?  No response.  Thank you.

19          So I'll pause before I hear from everybody.  If

20   anyone needs a recess, given how long we have been on the

21   record, please let the Court know.  Does either party wish

22   that at this time?

23          MS. GRUBER:  No, Your Honor.  Thank you.

24          MR. VARTAN:  No, Your Honor.

25          THE COURT:  Feel free to speak up to pause the

1    proceedings for anything of that nature.

2              I'll first hear from the government, please.

3              MS. GRUBER:  Thank you, Your Honor.  The

4    government stands here today requesting a significant

5    period of incarceration, the maximum $1 million fine, and

6    the maximum five years of supervised release.

7              THE COURT:  As far as what the government

8    considers the significant period of incarceration, does

9    the government call for any specific length or range of

10   sentence?

11             MS. GRUBER:  The government believes the Court

12   would rightly tret(ph) toward the higher end of the

13   guideline range in this case.

14             THE COURT:  The guideline range as determined by

15   the Court?

16             MS. GRUBER:  Yes, Your Honor.  The government

17   would also seek a special condition of supervised release

18   to which the defendant has agreed in his plea agreement

19   that the defendant shall be prohibited from engaging in

20   any real estate related business with respect to the

21   properties identified in the stipulation of offense

22   conduct other than is necessary for winding down.

23             The government also does not oppose any

24   additional supervised release conditions that are proposed

25   by the defendant.

1          We believe that a significant period of

2     incarceration is warranted here, notwithstanding the

3     efforts by the defendant to minimize loss.  This is a

4     complicated case.  We never said it was easy.  But what we

5     have said is that the defendants should not get away with

6     fraud because they managed to create a no loss situation

7     by the time they were sentenced.

8          We continue to believe that this type of offense

9     conduct deserves a significant custodial sentence to

10    incapacitate Jacob Deutsch, promote respect for the law,

11    and for specific and general deterrence.

12         The government relies on the stipulation of

13    offense conduct in the plea agreement, and we know the

14    Court has carefully reviewed the government's sentencing

15    submission for Jacob Deutsch which sets forth many

16    specific examples of the lengths to which this defendant

17    went to fraudulently build his real estate empire.  Those

18    are at pages two through 20 of our submission.

19         But that's just a fraction of the conduct here.

20    The conduct here spanned millions of dollars in loans, 24

21    different mortgage transactions, all carefully crafted by

22    Jacob Deutsch to obtain financing that he couldn't obtain

23    otherwise lawfully.  Jacob Deutsch knew how important it

24    was to convince his lenders that the buildings were

25    occupied, so he fabricated the evidence of it.  He

1    fabricated evidence of dozens of tenants over and over and
2    over.

3            He created fake tenant names, fake rent amounts,
4    fake move-in dates, fake leases, fake pieces of mail, fake
5    gas bills, fake electricity bills, fake checks, fake
6    expenses, fake business records, fake bank statements,
7    fake construction invoices, fake closing statements, and
8    it goes on from there.

9            They staged apartments with furniture.  They
10   made their employees bring in their own clothes to make
11   the apartments looked lived in.  They had their employees
12   pretend to be tenants.

13           Jacob Deutsch instructed them to lie on the
14   phone if someone asked probing questions.  They used the
15   names, driver's licenses, signatures and identities of
16   their employees without their knowledge to further
17   perpetrate this fraud.  They did this with other
18   legitimate tenants.

19           And when Freddie Mac's fraud department caught
20   wind, Jacob Deutsch paid someone to pretend to be a
21   property manager in an in-person meeting.  They created
22   hundreds of false documents, not just with the completely
23   vacant building they claimed was occupied.  They did it
24   for $50 million worth of loans approximately.

25           Jacob Deutsch eludes in his filing to how maybe

1   not all of the mortgages met the underwriting criteria.

2   We all have no idea.  They basically lied about every

3   single asset over and over, all the documents presented;

4   there's no way to know at this point.  It would be almost

5   impossible to unwind it all.

6          Now many of Jacob Deutsch's character references

7   express surprise at this lapse of judgment as if to say

8   this crime was momentary.  It was not.  Jacob Deutsch's

9   lapses were brazen, egregious, and they lasted for a

10  sustained period of years.

11         Now, the Deutsch's claim and Jacob Deutsch

12  claims he's a great landlord, that the assets are in

13  tip-top shape, that they made capital improvements.  And

14  that may be true now, but it wasn't true when they

15  acquired the buildings through fraud.

16         We think they got the money to fix up the

17  buildings by lying about the value of the buildings in the

18  first place.  So they stole more money to accomplish what

19  other real estate developers have to do honestly and

20  through slower growth.

21         Fraud is not an acceptable way to build your

22  real estate empire or end up with a high performing asset.

23  Even then, several of their buildings currently lie vacant

24  with significant blighted conditions apparent.  Sixty

25  Gillett Street is vacant.  Sixty-six Retreat is vacant and

1    blighted.  The Deutsches went to great lengths to pay down

2    the mortgages for these buildings so they could not be

3    considered by the Court for loss purposes.  But the

4    reality is that these buildings, like the City of

5    Hartford, and drag down the streets they are located at.

6           As for Mr.~Deutsch's commitment to the

7    community, he has yet to do business honestly in his own

8    name.  He couldn't.  He had filed for bankruptcy and

9    didn't have the credit to build the real estate business

10   he has today.

11          As a whole, we are not just talking about one

12   lie.  Mr.~Deutsch's entire real estate business was based

13   on lies to get mortgages.  That was the business plan.

14   This business was begun by someone who had committed

15   almost an identical species of fraud years ago, served

16   prison time, and learned nothing from it.  So he did it

17   again, and this time on a much larger scale.

18          I think they thought they could get away with

19   it.  But just because it worked out from a loss

20   perspective, doesn't mean it's okay.  The market could

21   have gone the other way, and it almost did.

22          The government submits that the balance view of

23   the 3553 factors should lead to a significant period of

24   incarceration.  Jacob Deutsch is a recidivist who learned

25   nothing from his last prison sentence.  He learned nothing

1    after he was arrested, because his last greatest loan, the

2    loan that caused the Court to find factors about loss

3    today, was a loan he closed through fraud after he was

4    arrested.

5         Thank you, Your Honor.

6         THE COURT:  Thank you, counsel.  To your point,

7    you raise several incredibly compelling arguments.  And so

8    my question having heard and considered them is, why

9    should the Court for all of those reasons that the

10   government persuasively has cited, why should the Court

11   limit Mr.~Deutsch to a sentence within the guidelines

12   range?

13        MS. GRUBER:  Well, Your Honor, we defer to the

14   Court's consideration of all the evidence.  It is our view

15   that in light of the prior period of incarceration served

16   by Mr. Deutsch in the early 2000's, we believe a

17   significant sentence is appropriate here and we completely

18   defer to the Court on calculating that.

19        THE COURT:  Thank you.

20        MS. GRUBER:  Thank you, Your Honor.

21        THE COURT:  Anything else from the government at

22   this time?

23        MS. GRUBER:  No, Your Honor.  Thank you.

24        THE COURT:  Thank you.  Attorney Vartan, would

25   defense counsel like to be heard at this time?

1           MR. VARTAN:  Yes, Your Honor, if I may.  May I

2    approach?

3           THE COURT:  Of course.

4           MR. VARTAN:  Thank you.  Again, Your Honor, we

5    appreciate you hearing from all of the folks who have come

6    in support of Mr.~Deutsch here today and we appreciate you

7    listening so intently to the arguments.

8           I want to start with something that the

9    government said in its remarks to the Court, that if there

10   were no prison time that Mr.~Deutsch would be, quote,

11   unquote, getting away with fraud.  And respectfully, that

12   could not be further from the truth.

13          Because of the delay in this case, and again, I

14   can't say enough thank you for it, I've gotten to know

15   Jacob Deutsch better than I get to know most of my

16   clients.  And I can tell the Court for certain this has

17   been an incredible burden and incredible weight on him and

18   all of the people who are sitting behind me in the

19   gallery, not because he feels put out by the prosecution,

20   but because he knows just how wrong the conduct was that

21   the government laid out.  He understands that he shamed

22   himself, that he shamed his family, that he --

23          THE COURT:  Why didn't he understand it after a

24   prior federal conviction that involved a period of

25   incarceration?

 1            MR. VARTAN:  It's certainly complicated, Judge,

 2   and I'll get into some of it.  I'm not a doctor and I

 3   wouldn't be able to diagnose Mr.~Deutsch.  But I can say

 4   for sure, as Your Honor has read, that Mr.~Deutsch in all

 5   respects has taken seriously trying to undo what he did

 6   here, and that was the extraordinary rehabilitation

 7   argument that I'm not going to repeat but I would bring

 8   back for variance purposes.

 9            But also working on himself in a very real way,

10   which he has been doing at this point for years.  So I

11   don't have a good explanation for you as to why Jacob did

12   what he did.  But I can tell you for sure, I can tell you

13   with certainty, as you heard from Rabbi Bryski, that he is

14   committed to never transgressing again.  That is why he

15   spent the time he has with Aleph.  That's why he spent the

16   time and continues to spend time with Dr. Mark Silver who

17   is in Court with us today.

18            He is committed and he has shown that for the

19   past year plus in dealing with the root cause of his

20   issues.  And, again, I can't tell you, probably no one

21   can, why he did what he did.  I'm not going to excuse the

22   conduct, he's not going to excuse the conduct, but the

23   fact of the matter is when I look at Jacob Deutsch I'm

24   looking at someone who has done everything within his

25   power to undo all of the bad that the government put on

1    the record.

2              THE COURT:  That's why the government is not

3    asking for the 30 years that the statutes allow.

4              MR. VARTAN:  Well, again, sentencing disparities

5    have to be considered by the Court, that's one of the

6    3553A factors.  And I'll get into what the judicial

7    sentencing network says about an offense level of 13 and

8    I'll get into that in the end.

9              But the fact of the matter is, and I think Rabbi

10   Bryski's comments were well-placed, we don't want to run,

11   we can't run from what Jacob has done, but I would ask

12   Your Honor to consider what has Jacob done since the entry

13   of his plea?  And since the entry of the plea, the story

14   is a very good one.  You heard about the efforts to sell

15   the buildings and you heard some about the efforts and

16   read some about the efforts to improve himself.

17             And at the end of the day to say he's getting

18   away with anything given what he's lived through these

19   past two years, all self-imposed, but understand that, and

20   I know Your Honor's background, you understand what this

21   means for an individual criminal defendant, whether he

22   walks out of this courtroom with home confinement or he

23   goes to jail, he understands the severity of the

24   situation.  This has changed his life.  Changed his life.

25             And so I do want to address the 3553A factors.

1    First let me start with the nature and circumstances of

2    the offense, because I think Your Honor struck upon the

3    exact right question and you posted it in your

4    November 6th order.  And in that order, Your Honor was

5    asking what has been the impact of Jacob Deutsch and BHPM

6    on the City of Hartford, and more importantly on its

7    residents.

8             And, Judge, we did our best to endeavor to

9    answer that question for the Court, because we think it is

10   the exact right question.  And, again, it's not to excuse

11   what Jacob has done, but I do think it's important in

12   considering the sentence to be imposed here.  Was this,

13   what I would call, a smash and grab operation?  Or get

14   rich quick scheme?  And I think the answer indisputably is

15   no.

16            Again, I'm not forgiving how he came to own

17   these buildings, but the fact of the matter is that when

18   he did own the buildings he did the right things.  He

19   invested in the buildings.  There's property management in

20   the City of Hartford.  That's why, Judge, the room is

21   filled today.  And it's not only with people from his

22   family or friends from Brooklyn, but there are people that

23   work with him day in and day out in the City of Hartford

24   who have come in support of Jacob Deutsch because he was

25   doing the right thing with the buildings.

1          THE COURT:  I understand that.  But to that end,

2     those capital improvements and those investments come with

3     a benefit, do they not, when it comes time to sell those

4     properties?

5          MR. VARTAN:  They absolutely do.  But they also

6     come with the benefit for the residents.  And that's what

7     we wanted to stress in the video that we sent to Your

8     Honor.  And you'll remember seeing the images, interior

9     and exterior of the various BHPM properties.  There were

10    millions of dollars invested in those buildings.

11         You saw the security cameras and the new roofs

12    and the HVAC systems and the gated parking lots.  He

13    helped to turn neighborhoods around, and that's coming

14    from multiple sources.  And you may remember in the video

15    there was a woman, Janine Williams, who was the lease

16    supervisor for BHPM.  And she said something to the effect

17    that they were the best in the business in terms of

18    renovating these apartments.  Nothing was left undone.

19         And we also submitted to the Court, I think it

20    was Exhibit L to my supplemental sentencing submission,

21    before and after photos of a number of the BHPM properties

22    showing exactly what the Deutsches invested in these

23    buildings.

24         And then, Judge, there's also the declaration of

25    Taylor Perun, I know I mentioned to you before.  But I

1  think it bears repeating, because he is an industry

2  expert.  He's been in this business for the previous 10

3  years focusing his efforts primarily in Hartford.  And

4  what he said in his declaration is that he could find, he

5  could think of no better owner, managers, than Jacob and

6  Aron Deutsch.

7          In his 10 years of experience, he said that they

8  treated each and every one of these buildings as if they

9  lived there.  They had an on-site management presence so

10  that if individuals had issues, if apartments needed

11  repair, there was a ready place for them to go and get

12  what was needed.

13          So again, not excusing the conduct, not excusing

14  how he came to own these buildings, but when he had them

15  he treated the buildings right, and more importantly he

16  treated the residents right.  And that is why when I

17  thought about coming here today and really packaging what

18  I wanted to get across to the Court, I think there's a

19  showstopper piece of evidence or two that I really need to

20  bring to the Court's attention.

21          And one of those pieces of evidence is a letter

22  from about a dozen and a half BHPM residents or former

23  residents who said, we don't excuse what Jacob Deutsch has

24  done, we know what Jacob Deutsch has done, but we are

25  still standing beside him, we are still willing to sign a

1    letter of support, and that's because he did all of the

2    things that you saw, Judge Williams, in the video, in the

3    pictures.

4            And I didn't want to come here today without

5    myself going to those buildings.  And you will hear from

6    Annmarie Davis with the Court's permission in a few

7    moments.  But Annmarie Davis is the operation's manager

8    for BHPM.  She has been working with Jacob Deutsch and

9    Aron Deutsch for about five years.  And if I was going to

10   come to Court today and represent Jacob adequately and

11   also give life to some of what I submitted to the Court,

12   it's important for me to see the actual buildings and the

13   renovations.  So I walked 194 Main Street -- I walked 194

14   Washington Street.  I walked 76 Main Street.  And those

15   buildings were new and clean.  And more importantly,

16   Judge, I spoke to a few of the tenants who live there.

17           They came up to Annmarie, spoke with me, and

18   they said to a T, I spoke to three or four different

19   people when I was there, said to a T, we lived in other

20   cities, we have lived in other buildings in Hartford, but

21   we have never lived in a place where we could truly call

22   it a home, and we can call these apartments home.  And

23   they said come on in, let me show you why.  And there were

24   new floors and new kitchen and bathrooms.  There was

25   demonstrable pride.  Some of them asked me to take my

1    shoes off before I would go in.

2            THE COURT:  But if all of this is the case, why

3    was this fraud still being perpetuated when the apartments

4    were to be inspected?  Why were there fake tenants then?

5    Why were there staged apartments then?

6            MR. VARTAN:  Again, I can't explain or excuse

7    that conduct.  To get back to a central theme of our

8    sentencing submission, there's no question that the

9    conduct here is bad.  But as Your Honor well knows, that's

10   just one of the 3553A factors for the Court's

11   consideration.

12           So if we were going to begin and end on staged

13   apartments and burner phones and fake tenants, then I

14   should sit down.  But that's not what sentencing is all

15   about.  And as the government itself acknowledged, this

16   case is hard.

17           THE COURT:  And to be clear, it's not all that

18   I'm focusing on, but it's significant.

19           MR. VARTAN:  It's no question significant, but

20   there are other significant factors.  And one of those is,

21   aside from the incredible work that was done by Jacob to

22   make the lenders whole, is a fact that when, however, they

23   came to own these buildings, when they owned the buildings

24   they were doing right by the buildings and the tenants.

25   That's what I was told when I was there in person.

1          And equally important in all of this is the

2    letter from Shiloh Baptist Church we shared with Your

3    Honor.  Because I would submit that there is, I don't know

4    the best word to use, but the letter that Carey Shea from

5    the Frog Hollow Neighborhood Association, that that was

6    not anything worthy of the Court's consideration.  It gave

7    a false impression of how Jacob Deutsch did business, does

8    business.  Carey Shea never lived in any of Jacob's

9    buildings.  In fact, two of the three buildings she put

10   forward as being owned by BHPM were not owned by BHPM.

11   And it's probably a good place to note that with respect

12   to 421 Washington Street and 66 Retreat and 60 Gillett

13   Street that the government just mentioned, those are not

14   blighted properties.  Those are buildings that the

15   Deutsches are actively renovating to sell.  And the

16   government knows that.

17          So we brought the letter from Carey Shea to

18   Pastor Albert Bailey and we had him speak with the

19   Deutsches.  We had him meet with other pastors, try to get

20   an understanding of what was, to answer Your Honor's

21   question, what was the impact of BHPM and Jacob Deutsch on

22   the citizens, on the residents of Hartford.

23          And Reverend Bailey, his parish which I went to,

24   is just a few blocks from the Evergreen Avenue properties.

25   And he said in that letter that he's fully familiar, he

1  used the term scum lords, he's fully familiar with the

2  out-of-town landlords who prey upon Hartford residents.

3  And he said, that's not Jacob Deutsch.

4         Jacob Deutsch has an office, 1010 Wethersfield,

5  where residents are free to go and bring any complaints

6  they have about any building.  He's here four days a week

7  in Hartford.  The only reason he's not here on Fridays is

8  because of religious obligations.

9         Pastor Bailey spoke about how even during, Your

10  Honor mentioned the COVID 19 pandemic, because I think I

11  may have mentioned it, but even then Jacob and Aaron were

12  providing safe and secure quality housing, not in any way

13  looking to evict or make life difficult for any of their

14  residents.

15         So again, not by excuse, but when you look at

16  what was the impact of the crime, which is certainly

17  something Your Honor should factor in under 3553A, on the

18  actual people who were living in the building, it's

19  resoundingly positive.  That's the impact that he had.

20         And this is probably with Your Honor's

21  permission an appropriate time for Annmarie Davis to say a

22  few words on behalf of Jacob.  As I mentioned, she is the

23  operations manager at BHPM.  I think what is so critical

24  for Your Honor to understand, she has been working with

25  the Deutsches for the past five years.  She has really

1    been a fixture in the office and she is effectively their

2    number two, their right land.  And she was the one who

3    asked can I come to sentencing, but not only that, but to

4    speak on Jacob's behalf.  And I said with the Court's

5    permission we would love to hear from you.  She was also

6    in the video, if Your Honor may remember.  With Your

7    Honor's permission, I would ask Ms. Davis to approach.

8                    THE COURT:  Sure.  Good afternoon.

9                    MS. DAVIS:  Thank you for the opportunity to

10   address the Court this afternoon.  I have worked with

11   Jacob for approximately five years, two months, two weeks,

12   and I would say two days, both Jacob and Aaron.  Until

13   they sold their buildings, I was responsible for managing

14   all the remodeling, renovations and tenants' issues to

15   each of the buildings.

16                    I will always be grateful to both of the

17   gentlemen who realized how hard I worked and consistently

18   promoted me because they realized my values and morals and

19   expertise and experience and the academic qualifications

20   that I bring to the company.  They helped to provide a

21   better life for my family and that includes my now 12-year

22   old daughter.

23         I understand what Jacob pled guilty to.  I know he

24   was wrong.  It is wrong.  I also know how sorry he is.

25   But I'm not here to speak on Jacob's crime.  That's not my

1    place.  But, Judge Williams, I wanted to be here today.  I

2    asked Jacob to be here today because I wanted not to just

3    appear in a video but tell you in person about Jacob as an

4    employer, a landlord, and a person.

5        Judge Williams, from having worked alongside this man

6    for the past five years, I can tell you he really and

7    truly cares.  He's very family oriented.  There's never a

8    day he won't ask me separate and apart from work how are

9    things going both at home, how is my daughter doing in

10   school and how is my family.  That's something I

11   truthfully admire.

12       He cares about his buildings.  He cares about his

13   employees.  And most of all, most importantly, he cares

14   about his tenants.  I cannot tell you how many tenants

15   have come to me and called the office and ask to speak to

16   me to say thank you, thank you for work order issues that

17   I have addressed.  Like the request for like new flooring,

18   new appliances.  They even say thank you for things that I

19   consider to be simple, the camera system I get for the

20   parking lot, that we get rid of the drug dealers.  The

21   laundry rooms for not having to go out in the cold, as

22   they would say.

23       Thank you for the community space, because a few of

24   our buildings do have community rooms where it's extended

25   to them, they can have barbecues for their family and

1    friends and whoever they choose to bring in the property

2    as long as they don't violate their lease agreements.

3        They go as far as to thank simply for a refrigerator

4    or stove, which I don't consider a big deal but it is,

5    because I guess there's a bliss that comes with newness.

6        Jacob and Aron invested millions of dollars in their

7    properties and then they cared for their investments.  As

8    you know, the Deutsches have sold most of their buildings.

9    And I can think of and I think Attorney Vartan spoke

10   earlier about five tenants who have personally came to me

11   and said are there any buildings that BHPM still owns

12   because I want to move.  Just as late as last Thursday,

13   one tenant said I moved from this property that you sold

14   because the new owners are not caring for the properties

15   like you guys did.  And I think that's very commendable.

16       And not to compliment myself or give myself a pat on

17   the shoulder, my OCD won't allow me to lead an

18   organization that -- and I'm a renter myself so I always

19   try to place myself in the tenant shoes and so I want a

20   clean environment to live in, and I make sure BHPM does

21   that for the tenants.  We clean the buildings, we clean

22   the outside peripherals, every day inside the building I

23   would say three to four times per week.

24       If a repair needed to be made, it was done as per

25   company policy, 24 to 48 hours, unless it requires a city

1  permit to do so.

2       Jacob never said no, and sometimes I wish he did.  In

3  fact, I can't recall him saying no to anything that we

4  would have needed on his approval.  Whether it be a tenant

5  need for a new appliance, a tenant would want a carpet to

6  be removed and install new flooring, even though sometimes

7  it's not necessary and we can shampoo their carpet.  No,

8  they want new floor and Jacob would say go right ahead,

9  because that's who he is or how I see him.

10      I have never ever been in a courtroom before.  I'm

11 from Jamaica.  I never planned to be in one and have never

12 been in front of a Judge before.  But, Judge Williams, I

13 could not think of a harder job for you.  You have to

14 judge and pass judgment on someone you have just met or

15 only known or read what people wrote about them, and this

16 is why I wanted to be here today.

17      I have known Jacob for over five years, October 20,

18 2018, to date, and have worked alongside him every day.

19 He is a good man and he cares about his tenants.  He cares

20 about the City of Hartford and he definitely cares about

21 his employees.  I don't know what caused him to do what he

22 did and it's not definitely not for me to find out, but I

23 know his heart is always in the right place.

24      I pray that you have mercy on him.  Thank you for

25 listening.

 1             THE COURT:  Thank you so much.

 2             MR. VARTAN:  Thank you, to Mrs. Davis, for those

 3    remarks.  Judge, I think you get the idea of the type of

 4    employer and landlord and owner that Jacob Deutsch was.  I

 5    don't know want to spend any more time there.  I do want

 6    to hit upon a few of the other 3553A factors and then I'll

 7    sit down.

 8             Your Honor asked before, why did he do this.

 9    And, again, I'm ill-equipped to provide any sort of answer

10    to the Court.  I think probably everyone here is.  Maybe

11    even Dr. Silver is ill-equipped.  But in sentencing Jacob,

12    the Court has to consider his history and characteristics.

13    And on this piece, on this piece in my view, having known

14    him, having become friends with him, over these past two

15    and a half years, there's really a remarkable story to

16    tell.

17             I say that because Your Honor read about how

18    Mr.~Deutsch came from a completely broken home.  It was a

19    traumatic and horrific childhood.  I'm always struck by

20    the words of his sister, his younger sister, from both his

21    mother and father, who said his childhood was marked by

22    extreme abandonment.  And in the video, in the

23    biographical video, Judge, she said something that really

24    just has stuck with me to this day.  She said that when

25    Jacob was 11, his mother didn't want to be bothered with

1    him anymore so she shipped him off.  Shipped him off to

2    Canada to his school where there was no mother, there was

3    no father, in a different country, and he never returned

4    home after that.

5        At 11, he was effectively on his own at this

6    school.  She sent him there with two suits that you may

7    remember he lost, as any 11-year old would.  And the

8    reason this story sticks with me in the way it does is

9    because my oldest is about 10 and a half and I can't

10    imagine shipping him anywhere.  But I certainly can't

11    imagine him functioning on his own in another country.

12        And Jacob Deutsch, and I don't know if this

13    explains part of the reason that we are here, obviously

14    the human psyche is incredibly complicated, but Jacob

15    Deutsch went to that school in Canada and he was in

16    perpetual fear.  He had no one to turn to, no one to rely

17    upon.  You may recall he said in a statement that he was

18    afraid to ask that a window be opened because he was too

19    hot and he didn't want to be an imposition.  He was afraid

20    that maybe he would be shipped off somewhere else.

21        And the reason I bring this to the Court's

22    attention, again, is not by way of excuse.  But it really

23    is to understand how Jacob could have easily been angry

24    and bitter and turned inward.  But that's not who Jacob

25    Deutsch became as an adult.  You read the letters.  I'm

1    not going to belabor them.  But he's a loving and caring

2    husband and father and grandfather.  He really is the

3    father that he never had.

4         And more to the point, Judge, he looked beyond

5    all of the wrongs that had been visited upon him by his

6    parents.  He really was the glue who held his family

7    together, who continues to hold his family together.  He

8    forgave his father and forgave his mother.

9         And what is maybe most remarkable in all of

10   this, and this is what I look at, I look at what was he

11   doing years before we ever even thought about being in

12   this courtroom on January 8th.  And the story there is

13   really, Judge, such a good one.  Because years before

14   there was any prosecutor to impress, years before there

15   was any Judge Williams to impress, Jacob Deutsch committed

16   himself to charitable works in Israel, in Brooklyn, and in

17   Hartford, thousands of hours, really, Judge, when no one

18   was looking and there was no thought that there would ever

19   be an attorney standing up advocating for mercy on his

20   behalf.  And that's really borne from the fact that he did

21   not want to see anyone victimized, traumatized, in the way

22   that he had been as a child.

23        THE COURT:  To that point, I was going to

24   interrupt earlier just to note that the Court is aware of

25   and mindful of the nature and extent of the trauma that is

1    highlighted within the defense briefing and that because

2    of the nature will not specifically reference it further.

3           MR. VARTAN:  We appreciate that and that's

4    exactly why I passed by it, but I appreciate Your Honor

5    acknowledging it.

6           But the fact of the matter is, Judge, that he

7    really has committed himself to being sure that complete

8    strangers have a hand-up, his home, Schiffer's home, as

9    you read about, they are open to everyone in the

10   community.  I'm not going to go through letter by letter,

11   but there's a reason that all of these people are in the

12   courtroom today.  There's a reason that Annmarie Davis

13   asked to speak on Jacob's behalf.

14          So I think the final point or two that I would

15   mention, and I don't want to repeat Rabbi Bryski, but

16   certainly Your Honor has to consider specific deterrence,

17   general deterrence, and the fact of other correctional

18   remedies, I believe it is, under 3553A.

19          And there, again, I come back to the fact that

20   Jacob Deutsch is already engaged in significant self-help.

21   Significant self-help that a number of Courts, and we

22   cited this in our briefing materials, have recognized are

23   deserving of a downward departure or variance under 3553A.

24          So I understand that it's easy for the

25   government to stand up and say that Jacob has done all of

1    those things because he wants to present the best

2    sentencing package.  And I understand it's equally easy

3    for me to say no, no, no, he's doing it because it's

4    actually genuine, it's real.  But that's why we wanted to

5    have Aleph come and speak on his behalf and that's why

6    Dr.  Silver is in the courtroom today.  And that's why I

7    wanted you to hear from Annmarie Davis, because this case

8    is hard.  This case is hard.

9            We don't forgive his conduct, but he is so much

10   more than that one 3553A factor.  And if I had to end up

11   on any one point before Mr.~Deutsch speaks to the Court

12   directly, it really is, I call this a unicorn of a case,

13   at least in my experience as a prosecutor and defense

14   attorney.  A one in a thousand case.  Maybe more.  And the

15   reason that I say that is because of, no matter how bad

16   things were prior to our involvement in this case, meaning

17   the attorneys' involvement, they have been so incredibly

18   good since then.  And that's not because we said to Jacob

19   you need to be in the best position for sentencing.  Sure,

20   we want to make these arguments, we are entitled to make

21   these arguments.  But they came from Jacob himself.

22           Jacob himself said no more, I'm going to sell

23   off these properties, even the properties that don't need

24   to be sold because there's no loss under the guidelines.

25   I'm going to go and see Mark Silver every week and seek

 1    out help from the Aleph Institute.  I'm going to pay

 2    restitution, $222,000, no questions asked, before I get to

 3    sentencing.

 4        And I've never seen someone who may have done a lot

 5    wrong, do so much right in the end all on his own, all

 6    self-motivated.  So much so, Judge, that you saw two of

 7    the four victim lenders are actually writing in support of

 8    Jacob Deutsch.  And when the government turned around and

 9    said are there any other victims in the courtroom, there's

10    no one here.  There's no one here because Jacob Deutsch,

11    whether you call it extraordinary rehabilitation or

12    restitution, or you say instead it's deserving of a

13    variance under 3553A, I have not seen a case, I don't

14    think I'll ever see a case quite like this one.

15        And when you look to, and the probation officer cited

16    it in his report, when you look to an offense level of 13,

17    criminal history category 1, the sentences that have been

18    imposed across the country, a full 40 percent of them, no

19    jail.  And make no mistake, that's what we are seeking

20    here and we think is appropriate here.  But a full

21    40 percent of them, no jail.  Sixty percent of them had an

22    average sentence imposed of eight months and a median

23    length of imprisonment of six months.  And this is right

24    from the JSIN website.

25        And so where I would end in all of this, and Your

1    Honor has to question why shouldn't I go above the

2    guidelines, from our perspective, given all that I went

3    through with the Court, given all that Jacob will talk

4    about and what you heard from Annmarie Davis, there's

5    ample reason to go below the guidelines here.  Ample

6    reason, because I have never seen a defendant do what

7    Jacob Deutsch has done.  I don't think I'll ever see a

8    defendant do it, do the same, both with the bad comes a

9    lot of good.

10        And so I would ask humbly, Judge Williams, that you

11   look to depart or vary below the guidelines.  Give him a

12   noncustodial sentence, make sure there's a significant

13   community service component to his sentence, make sure

14   there's a significant fine.  He's already committed as we

15   have said in our briefing that there be no profit, which

16   is another reason that this is extraordinary, that there

17   be no profit to him from the sale of these buildings.  We

18   ask you consider varying to some period of home

19   confinement, some period of community service, and a

20   significant financial component.

21        And I think with that, Mr.~Deutsch does want to

22   address the Court if Your Honor will allow.

23             THE COURT:  Sure.  Of course.  Thank you.

24             THE DEFENDANT:  I was afraid that I was going to

25   lose my thoughts, so I made some notes.

1            THE COURT:  Take your time, sir.

2            THE DEFENDANT:  I understand the significance of

3    this day.  It's probably one of the hardest days in my

4    life.  I don't like when people talk about me.  It was

5    never about me.  And I don't want to, Your Honor, you read

6    about my past, I don't feel my past has nothing to do.  I

7    was born how I was born, I came in this world how I was,

8    and I tried by best.  I don't need mercy for that.  I am

9    who I am and I try the best to be all my life who I should

10   be.

11           I want to thank first my wife, my children.  I

12   want to thank Aleph and Dr. Silver, and also the

13   charitable organizations which gave me an opportunity.  I

14   remember the first time I went, after my arrest I went

15   back to the House of Bread.  They told me you cannot

16   volunteer over here, you were arrested.  And I called up

17   the Aleph organization and I said maybe we can find

18   somewhere else, because I can't go back over there.  Aleph

19   called up and talked to them and they said, you know what,

20   you can come back.

21           I want to thank my employers of BHPM.  It took a

22   long time, and real estate management is the most

23   troubling aspect in real estate.  And it took a long time

24   coming from New York every day, two and a half hours and

25   going back, to establish good people, people who don't

1    steal, people who are loyal and tell me what they tell for

2    the tenants, which we should be able to rely on them.  But

3    by the end of the day we got a very good staff together

4    and a very loyal staff.

5            Most of all, I have to thank you, Judge

6    Williams, because as I will explain, but I think without

7    you, it wouldn't be victims.  I cannot say victims because

8    there was a lot of money in the properties.  But because

9    of you, it's not even a question.  Everything is sold and

10    everybody today, we talked about 194 and I know Your Honor

11    already ruled on that, but I'll still say it.  194, all

12    documents, all closing documents are signed.  It's in

13    escrow with the title company.  So it's not like we are

14    saying everybody said there's a contract, it's

15    $50 million.  No, it's closed actually.  It is by the

16    title company.  The insurance was not on the right name,

17    they wanted, the bank wanted a different insurance name,

18    and a small few tiny things.  Plus it's a very complicated

19    closing because it's two properties, it's Gillette,

20    Marshall, and 194 for one buyer.  And we wanted to make

21    sure that both closes.  So one is -- and that complicates

22    the length of the closing.

23            I read what the government said about me.  They

24    mean good.  They want to protect the City and they want to

25    protect everything.  And it's a big question like Your

1   Honor asked a few times, why did I do this.  Did I do

2   everything for money?  I would just say one thing for Your

3   Honor and I will talk with my heart and I hope it goes

4   into your heart.

5          I have a friend, very rich guy who knows me very

6   good.  And he talked to me a long time ago, Jacob if you

7   would want to make money you would make a lot of money.

8   You don't want to make money.  You just want to have, you

9   want to do and help, but when it comes for you to make

10  money you don't know how to make money.

11         I had one time a position that I had an argument

12  with partners and I went in my way because I didn't want

13  to fight, and I bought basically a building of a million

14  square feet.  I bought it for $500,000 and somebody needed

15  space because it collapsed, the roof.  And in a few days

16  he paid me $4 million for a half of the building.  It was

17  a lot of money at that time.  I took the whole money and

18  put it in the business.  I didn't take it.  I didn't

19  take -- this was my money.  There was no mortgage, no

20  nothing.  It was simple money.  I didn't take it.  I was

21  always helping people.  My father died --

22         THE COURT:  Just to pause you so I understand

23  what you are saying.  You reinvested that money in your

24  own business.

25         THE DEFENDANT:  Correct.  Everybody told me you

1    made $14 million, get a partner, go into business, take

2    the money and put it away for yourself.  No.  I took it

3    and I put it in business.

4              THE COURT:  But you acknowledge that you

5    benefited from that?

6              THE DEFENDANT:  Yes.  Yes, Your Honor.  And I'm

7    saying that in my nature, whatever, I never looked out

8    that I should put for myself money.

9              THE COURT:  Sure.  But I'm making the simple

10   point, this was far different than taking that income and

11   putting it to a charitable purpose, for example?  This is

12   not that.

13             THE DEFENDANT:  It was a little because it was a

14   small town and basically it was very hard to make a

15   business over there.  And the reason we made it over there

16   was because it would bring jobs for that particular place.

17   It was Jamestown, New York.  But you are right, Your

18   Honor.

19             THE COURT:  It's a stretch of the definition of

20   charity.

21             THE DEFENDANT:  It's not charity.  Absolutely

22   not.  Why did we come to Hartford?  We live in New York.

23   It's two-and-a-half hours away.  I'm sorry if I'm taking a

24   lot of your time, Your Honor.

25             THE COURT:  I'll give you all the time you need

1    as I have since the time of your plea.

2                    THE DEFENDANT:  And you told me, Your Honor,

3    that there's two times when to talk, if I want I could

4    talk both times and so I remember that.

5                    THE COURT:  Sure.

6                    THE DEFENDANT:  Why Hartford?  Why not

7    Pennsylvania?  Why not New Jersey?  New York?  Why did we

8    come to Hartford?

9                    We went around and we wanted to see and we

10    believed before we started to buy the first building --

11    actually the first building was 421 Washington.  What we

12    bought in 2017, the end of 2016, we wanted to see where we

13    could make a difference.  We weren't looking so much for

14    money.  We were looking to see how we could have a

15    stabilized business and make a difference in the

16    community.

17                    And we came to Hartford and we saw that

18    99 percent of the landlords were from out of state, don't

19    have an office over here; they have a phone.  It's

20    abandoned buildings.  The elevators were never fixed, the

21    kitchens were not fixed, the roofs were leaking, the

22    heating systems are not good.  There was a lot of where

23    you could improve.

24                    And when we asked and sat with the people and

25    asked them why are you not fixing up your own buildings,

1    they told us nobody makes money over here.  It's not

2    worth.  We are it floating it and in a few years it goes

3    up in price and we are selling it, we are not here for the

4    long run.  And I'm talking about landlords who have

5    thousands of apartments.

6            And we came in and I said this is basically a C

7    minus.  And, Your Honor, a C minus means for low-income

8    people who are working in bodegas or people who don't have

9    a lot of money.  And I said what if we start to make a

10    model that we give them such a comfortable life like the

11    middle guy has or the rich guy in downtown has, and maybe

12    because of that we will get better tenants, not drugs and

13    other things.  And we will make good rents also.  They are

14    going to pay the rent and we will make a business model

15    out of it.

16            My partner told me, you are crazy.  You are

17    really crazy, it's never going to work.  And we said let's

18    try it.  We bought 421 Washington.  It had big ceramic

19    sinks, what it was a half tub.  I don't know if Hartford

20    has this in any other buildings, these huge rusted sinks.

21    We put in new kitchens and renovated it, and we are in the

22    middle of renovating it now.  We put even an

23    air-conditioning and heating for each apartment, because

24    we wanted to put in such buildings, when we made a test of

25    the boiler of the pipes of the gas the plumber told us

1    it's leaking all over the place so you have to redo all

2    the pipes.  And this was for years and we had a lot of

3    buildings like this.

4            So, did we want to make money in this model?

5    Yes, we wanted to make money.  Did we choose to make money

6    in a way that we could bring some benefit to the City and

7    to the tenants?  Absolutely.  Why did we do it?  I don't

8    know.  That's my nature.  It doesn't have why, because we

9    could have made easier money in closer places to New York

10   City and much easier than that.

11           We came every day two and a half hours.  We were

12   here four times a week.  By the snow storms, I came in the

13   snow storms.  I came every day in COVID in the office to

14   sit down with tenants when only 40 percent of our tenants

15   paid the rent, because I knew I had to pay the mortgages

16   and I have to pay the insurance and pay the taxes.  And I

17   can tell you, I know we will talk about my crime what I

18   did, a lot of crimes, but we never missed a payment and we

19   never not paid a vender.

20           So, yes, we did a lot and we did it fast, and we

21   did it with lies.  We did it with -- but I'm not excusing

22   why I did it.  I did bad things.  And I don't want Your

23   Honor should think that I'm justifying it, but I'm just

24   telling you my heart what is the truth.  And maybe sitting

25   on the bench or from a prosecutor's stand, they will never

1    understand it, but I have to say it.  We would have always

2    gotten the loans.  We never did something that the banks

3    should be in jeopardy.  Because if the banks would be in

4    jeopardy, we wouldn't be able to make the payments.  We

5    wouldn't be able when the rents, when it was filled up, to

6    make the payments.  We never walked away from a closing

7    and said oh, we bought it so good because we got more

8    money, let's take $50,000 for us.  We never did this.  Not

9    even one closing from all the 24.

10                So, yes, some closings we gave this document,

11   some, other documents, and I did a very bad thing.  And

12   you are going to ask me, you were incarcerated, why did

13   you do it again?  Your Honor, I'm working with God every

14   day.  We make mistakes and we do crimes, big crimes.  But

15   nobody knows, only God and us.  And we are asking every

16   day, God, I'm going to be better tomorrow, I want to look

17   forward.

18                So I can't answer why.  I'm working with whoever

19   I could.  To bring me to I shouldn't do it, has nothing to

20   do that you are going to learn your lesson now or not

21   learn your lesson now.  I'm learning my lesson as we

22   speak.  The three years, what I have I'm learning every

23   day when I wake up in the morning, I learn my lesson.  Not

24   a mistake, I did a crime.

25                And what bothers me even more than what nobody

1    knows is that we could have all of this without it, and

2    that's actually the pain, not an excuse.

3            Saying that when the government arrested us was

4    the day after that we had a holiday, we try to offer the

5    first minute for the government forfeiture that we don't

6    want to proffer, that we did a mistake.  We never said no.

7    We said for the government, what do you want to settle

8    this because we made a mistake and we want to move on.

9    And if this would be the case that because I had a prior

10   offense, there's no remedy for me, why did I do it?  And I

11   saw the government said it to my lawyers that you have a

12   prior offense, we will never agree to nothing.  And to be

13   honest with you, Your Honor, I didn't sell the buildings

14   because I have a trial.  I didn't sell the buildings

15   because I'm standing with you today.  I know it makes

16   sense.  It makes sense and it doesn't make sense what I'm

17   saying now.

18           But the fact of the matter is, I did it because

19   I was good with the officers of the bank and we had a

20   beautiful relationship, and I paid my mortgages and I saw

21   that in order to make sure that nobody becomes a victim,

22   even slightest idea, that's the right thing to do and

23   without profit.  And that's why we did it.  And that's why

24   I'm not saying this to you in a sense that I'm pleading

25   for a better sentence or I'm pleading look at what I did.

1    I'm just telling you what I did.  And this is what I did,

2    Your Honor.  I did it because I felt that I want to make

3    sure that all the businesses are out of my predicament,

4    for that simple reason.

5           And it was not luck, this three years.  It

6    was -- it's very hard today in Hartford to sell a

7    building.  And Your Honor asked before that because of

8    your fraud you could sell the buildings.  It's true, I

9    cannot say no.  But in other senses 99 percent of the

10   people who do such fraud take the money and live with it.

11          I didn't go one time on vacation from 2017 when

12   I came over here.  I worked every day without the Jewish

13   holidays, even a lot of times I came up Sunday not to

14   close buildings, not to make new deals, just to satisfy

15   and to work with the tenants.

16          And my heart is to tell Your Honor, I didn't

17   sell the buildings because I should have a better

18   sentencing.  And if you don't want to look at it as

19   extraordinary, whatever, I will understand.  And I look at

20   it as a two-part plan and I told my attorney.  Number one

21   is, I have the will and I wanted to it.  I don't know if

22   I'm going to be successful and I don't know if I'm going

23   to be able to sell it.  It's very hard in Hartford right

24   now to sell buildings.

25          It happens to be that we sold it because our

1    buildings were good and I'm very happy about it.  But I

2    didn't do it, when I went in and we put it out on the

3    market and started the hard work, it was not a given.  It

4    was not that it's going to happen.  And we didn't know it

5    was going to happen.  And if not, I would tell you today

6    at my sentencing, Your Honor, that I tried my best to do

7    it, and I went out of my way and put in how much time I

8    could to take up everybody we had, something, what could

9    lose, and it's not going to happen.

10            If there's any comfort today, I would say really

11   that I could say I sinned, I did bad things.  But, Your

12   Honor, there's in this Court, and I'm not pleading for

13   myself, there's my kids and my wife and my friends.  And

14   they know that from when it started I was six to eight

15   hours a day studying what I didn't do before.  And I

16   showed for everybody that even though maybe I don't have a

17   chance, but I have to try.  And they know that I put in

18   the extraordinary effort.  If not selling the buildings

19   and if not doing anything for my buildings, I did it with

20   my tenants.  They should be comfort.  I did it in my

21   surroundings and spiritual life, and I worked on myself.

22            And because of that, Your Honor, the same way

23   like you, award my wife; she had a hard life, and my kids.

24   I'm going to survive.  I want you to take them in

25   consideration more than me.  Thank you, Your Honor.

1          MR. VARTAN:  Thank you.

2          THE COURT:  The Court will note based on some of

3    the comments from Mr.~Deutsch, the Court generally

4    hesitates to interrupt particularly a criminal defendant

5    when they are taking the opportunity to address the Court.

6    But, Mr.~Deutsch, in this instance the reason that I did

7    so was for clarity of one of your points and certainly not

8    to limit your comments, and I hope you understand that,

9    sir.

10          THE DEFENDANT:  Yes, sir.

11          THE COURT:  Now, secondly, the defense

12    referenced the House of Bread as it did in its memoranda.

13    And the Court wanted to note for the record that on Friday

14    the undersigned presided over a number of naturalization

15    ceremonies and after one of them there were three

16    individuals, representatives of the House of Bread, who

17    introduced themselves to the Court simply to thank the

18    Court for its comments at that naturalization ceremony.

19    They didn't mention this case or the defendant, nor did

20    the Court mention Mr.~Deutsch or this case in any way.

21    But because that organization was mentioned by the

22    defense, I wanted to disclose that fact with that

23    clarifying remark in the event that either party wished to

24    be heard as to that communication with the Court in any

25    way.

1                Does the government want to be heard?

2                MS. GRUBER:  No, Your Honor.

3                THE COURT:  Defense?

4                MR. VARTAN:  No, Your Honor.

5                THE COURT:  All right.  Anything further from

6     either party before sentencing?

7                MS. GRUBER:  Yes, Your Honor, just briefly.  The

8     government appreciates the remarks of the defendant here,

9     but just wants to note that we are left with the

10    impression that he's not remorseful.

11               What I didn't hear was, I'm sorry.  What I

12    didn't hear was, I shouldn't have done it.  What the

13    government heard was, it ended up all right, it was my

14    charity to the City of Hartford.  And the government

15    believes that's a reflection of having not learned his

16    lesson previously after Court involvement and an

17    incarcerated sentence.

18               If Your Honor has questions, I'll be happy to

19    answer them.

20               THE COURT:  Just to clarify, the Court

21    understands the government's position, but also

22    understands it to be that -- well, the Court notes that

23    the government has not asked to withdraw its motion

24    related to the finding that the defendant has accepted

25    responsibility; is that correct?

1            MS. GRUBER:  Correct, Your Honor.

2            THE COURT:  Does defense wish to be heard

3    further?

4            MR. VARTAN:  Just briefly.  Obviously as Your

5    Honor saw, Mr.~Deutsch had prepared remarks, but he was

6    very much speaking extemporaneously and from the heart.  I

7    think he made clear and we made clear in his remarks and

8    what he told U.S. Probation and my sentencing submissions

9    which he read and signed off on, that he understands that

10   what he did here was not a grievous mistake, a grievous

11   crime.  And really what he was trying to impart to the

12   Court was the same thing I was trying to impart for the

13   sum total of the two-and-a-half hours or more that we have

14   been here, Judge, which is notwithstanding the crime,

15   notwithstanding the nature and circumstances of the

16   offense which we concede, we have nothing to say beyond

17   what the government set forth is correct, that he's taken

18   really, I'll use the word again, extraordinary steps to

19   correct those mistakes.  And you heard the reason that he

20   did that is because, he told you in his own words, he

21   sinned.  And every morning he wakes up looking to make

22   amends with his own God and his religion, and understands

23   that the first step on that road to redemption was to sell

24   these properties even though he was not required to.  And

25   to go see Dr. Silver and the Aleph Institute and work on

1    himself, the six or eight hours a day he spoke about, so

2    certainly his contriteness and the fact that he very much

3    recognizes why he's here was in what he said to the Court.

4          And I think Your Honor understands that he was

5    trying to speak from the heart and explain himself as best

6    he could in the short amount of time he had.  Thank you.

7          THE COURT:  Anything further from the

8    government?

9          MS. GRUBER:  No.  Thank you, Your Honor.

10          THE COURT:  Thank you, all.  Before the Court

11    imposes sentence, I thank our Court employees for your

12    patience as well.

13          I should ask, does probation have anything it

14    wishes to address, Officer Leone?

15          PROBATION OFFICER:  Nothing from probation, Your

16    Honor.  I apologize for arriving late, Your Honor.

17          THE COURT:  I saw when you came in, Officer

18    Leone.  I will say I greatly appreciated your work in this

19    case, the presentence report, all of its addenda and

20    updates to the Court as recently as Friday and then again

21    last night, I thank you for all those efforts and your

22    communications with the Court with respect to your delayed

23    arrival today which was for unanticipated reasons.  And

24    additionally, your making sure that there would be

25    coverage from probation today.  So thank you for all of

1     those things, Officer Leone.

2               PROBATION OFFICER:  Thank you, Your Honor.

3               THE COURT:  Specifically, also to give Madam

4     Court Reporter a bit of a break before I make my remarks,

5     the Court will stand at a brief recess.

6               The Court stands at a brief recess.

7               COURTROOM DEPUTY:  The United States District

8     Court is now in recess.

9               (Whereupon, a brief recess was taken).

10              COURTROOM DEPUTY:  The Court is open after

11    recess.

12              THE COURT:  Thank you for your patience.  I'm

13    sorry the recess was much longer than it originally

14    wanted, but that was because the Court wanted to take the

15    time to carefully consider the development of the

16    arguments today and the situation which Mr.~Deutsch has

17    placed himself.

18              This is a non-violent crime and Mr.~Deutsch

19    undoubtedly made significant efforts to limit the

20    financial impact to the victim lenders.  And while

21    Mr.~Deutsch has a previous criminal record, it's dated.

22    However, he served a period of time in federal prison for

23    previous criminality, and the present crime constitutes a

24    serious offense that was committed with intent and with

25    repetition.

1            Investigating mortgage fraud takes time, it

2   takes resources, but it's done because this type of crime

3   can lead to blight, despite the defendant's asserted

4   improvements to the properties in this case.

5            This type of crime can also result in inflated

6   rental and ownership prices and in limiting housing

7   options, even without known as foreclosure and even

8   without realization of the unintended risks of lenders and

9   the insurance companies and the market overall as cited

10  throughout the government's briefing.

11           This type of fraud also blocks property

12  purchases by law-abiding citizens and companies in

13  attempting to participate in a real estate industry that

14  continues to show elements of discrimination.

15           For example, racial bias has proven persistent

16  in limited lending opportunities in the cost of those

17  loans, if they can be obtained in the first place, and in

18  the appraisals of minority-owned property.  But real

19  estate ownership remains a critical manner of acquiring

20  wealth and financial independence and it also presents

21  business opportunities, like the ones fraudulently

22  obtained by Mr.~Deutsch.

23           To be clear, Mr.~Deutsch is not being accused of

24  that type of discrimination and instead he's presented the

25  support that he enjoys from a variety of people and

1    organizations with whom, with which he has been engaged

2    throughout his work.

3            However, the defendant's type of criminal

4    activity adds to the significant obstacles to fair

5    opportunity that already plague the real estate industry.

6    Mr.~Deutsch, you, yourself, mentioned that without your

7    admitted fraud, you still would have gotten your loans

8    otherwise.  That's exactly one reason why your fraud was

9    so inexplicable, particularly after a previous federal

10   conviction and a jail sentence, after which you went

11   almost two decades without being caught for similar

12   conduct, and yet you then decided to return to that

13   misconduct.

14           While the cost of investigating mortgage fraud

15   is high, so is the cost of not ensuring adherence to the

16   law, because the real and the potential consequences of

17   this type of crime, they are serious, as noted and

18   carefully detailed throughout the government's briefing.

19           Therefore, punishment and deterrence, both

20   general and specific deterrence, are worthwhile,

21   especially for repeat offenders.

22           If Mr.~Deutsch were to present on these facts

23   without any criminal history, the Court would be in a

24   position to seriously consider the need to impose a

25   sentence involving incarceration for this non-violent

1    conduct given the remedial actions of the defendant.  But

2    the Court is not in that position, and instead must

3    fashion an appropriate sentence for the defendant's

4    extended detailed fraud that Mr.~Deutsch committed,

5    leaving himself in a situation where the parties agree

6    that Amendment 821 doesn't apply in this case.

7        Mr.~Deutsch, you were an adult at the time of

8    your previous federal conviction and it didn't prevent you

9    from returning to criminality of the same nature.  Neither

10   did the law, nor your will, were able to prevent you from

11   committing another crime of this same type.

12       The defense cites to the support of comments of

13   the defendant's current tenants and others, but the Court

14   doubts that the same position would be taken by the

15   perspective purchasers of those many properties purchased

16   by the defendant through fraud.

17       The Court doubts that those perspective

18   purchasers who missed out on the opportunities to obtain

19   and renovate these buildings through lawful means would

20   take the same position as did the supporters presented to

21   this Court.

22       Defense counsel argues that the defendant is

23   much more than the one 3553A factor related to the nature

24   and circumstances of his offense, but the Court reiterates

25   that when we refer to the defendant's conduct as one 3553A

1    factor, it certainly was not a single act.

2         Mr. Jacob Deutsch committed a string of

3    sophisticated and premeditated fraud.  The Court

4    acknowledges that the defendant's arguments regarding his

5    upbringing and his medical condition are worthy of

6    consideration, but the Court finds them to be outweighed

7    by the seriousness of the defendant's criminal conduct and

8    the need to impose a sentence that promotes respect for

9    the law and that ensures just punishment.

10        For those reasons the Court finds it necessary

11   to exercise a variance from the sentencing guidelines.

12        Mr.~Deutsch, please rise.  For conspiracy to

13   commit wire and mail fraud affecting a financial

14   institution in violation of 18 U.S.C. Section 1349, the

15   sentence of the Court is that you be committed to the

16   Bureau of Prisons for a period of 62 months, that's five

17   years two months, followed by four years of supervised

18   release.

19        The $100 mandatory special assessment is imposed

20   as is a $10,000 fine, which considers the defendant's age

21   and length of incarceration which varies from the sentence

22   guidelines recommendation.

23        Probation usually asks that the Court read out

24   loud the conditions of supervised release, so the Court

25   will do so.

1          One, do not commit another federal, state or

2     local offense.

3          Two, do not unlawfully possess a controlled

4     substance.

5          Three, do not unlawfully use any controlled

6     substance.  You must submit to one drug test within 15

7     days of release on supervised release and at least two

8     periodic drugs tests thereafter for use of a controlled

9     substance.

10     Four, you must pay the special assessment imposed in

11     accordance with 18 U.S.C. Section 3013.

12     Five, you must provide a DNA sample as required.

13     In addition to the standards conditions of supervised

14     release, the Court also orders the following special

15     conditions.

16     One, you must complete a mental health evaluation and

17     any treatment program recommended by probation and

18     approved by the Court.  You must follow the rules and

19     regulations of that program and if any medication is

20     prescribed you must take it as prescribed.

21     The probation officer along with the treatment

22     provider will supervise your participation in that

23     program.  You must pay for some or all of that treatment

24     based upon your ability to pay as recommended by probation

25     and as approved by the Court.

1        Two, you must complete a substance abuse evaluation

2   and any inpatient or outpatient treatment or counseling

3   that's recommended by probation and that is approved by

4   the Court.  You must follow the rules and regulations of

5   that program.  Probation will supervise your participation

6   in the program.  And you must pay all or a portion of the

7   cost associated with the treatment based on your ability

8   to pay and as recommended by probation and as approved by

9   the Court.

10        Three, you must submit your person, residence, office

11  or vehicle to a search conducted by United States

12  Probation Officer at a reasonable time and in a reasonable

13  manner based upon reason suspicion of contraband or of

14  evidence of a violation of a condition of release.

15  Failure to submit to a search may be grounds for

16  revocation.  You must inform anyone who lives with you

17  that the home may be subject to searches pursuant to this

18  condition.

19        Mr.~Deutsch, do you understand and agree to comply

20  with each and every one of these conditions of your

21  supervised release, sir?

22             THE DEFENDANT:  Yes.

23             THE COURT:  The Court declines to further limit

24  the defendant's business practices as requested by the

25  government and does so based upon the length of the

1    sentence imposed finding further that it hopes that this

2    sentence will discourage later criminality together with

3    the public nature of the significant sentence.

4         At the same time, the Court acknowledges that

5    the statutory exposure was much greater than was imposed

6    by this Court given the defendant's acceptance of

7    responsibility within the limits that were highlighted by

8    the government today, but also the defendant's efforts to

9    mitigate the effects of his criminal conduct.

10        Does either party know of any reason why any

11   portion of the Court's sentence as imposed is illegal?

12        MS. GRUBER:  No, Your Honor.  But just one item

13   to add.  The defendant had agreed to a special condition

14   of supervised release in his plea agreement at page two,

15   that he shall be prohibited from engaging in any real

16   estate related business with respect to the properties

17   identified in the stipulation of offense conduct other

18   than is necessary for winding down.

19        THE COURT:  That was a stipulated condition.  I

20   apologize.  Does defense want to be heard?

21        MR. VARTAN:  No, Judge.

22        THE COURT:  The Court will add that condition

23   then by agreement of the parties.

24        MS. GRUBER:  Thank you, Your Honor.

25        THE COURT:  Thank you for noting that, counsel.

1  Any reason known to the defense why this sentence is

2  illegal?

3          MR. VARTAN:  No, Judge.  The Court hereby

4  imposes that sentence as stated.  The judgment of the

5  Court will be prepared by the Clerk's office in

6  consultation with probation in order to be signed by the

7  Court.

8          With respect to appellate rights, Mr. Deutsch,

9  to the extent you have any grounds to appeal your sentence

10  and wish to do so, you must file written notice of your

11  appeal within 14 days of entry of this judgment.  Do you

12  understand that, sir?

13          THE DEFENDANT:  Yes.

14          THE COURT:  If you wish to appeal but can't

15  afford to do so, you may apply for leave to appeal in

16  forma pauperis.  If that's motion is granted, the Court

17  will waive your filing fee for an appeal and a lawyer to

18  represent you at no cost to you.  Do you understand that,

19  sir?

20          THE DEFENDANT:  Yes.

21          THE COURT:  Mr.~Deutsch was out on unsecured

22  bond since his arrest in May of 2021.  There's not been

23  any record to suggest the violation of his conditions of

24  release.  He's also been winding down his business.  So

25  for those reasons, together with the fact that he showed

1    up on time today knowing that he was exposed to immediate

2    incarceration and significant incarceration, and also that

3    he remained during the recess, the Court orders

4    Mr.~Deutsch to self-surrender under his own power and

5    expense directly to the facility designated by the Federal

6    Bureau of Prisons no later than 12:00 noon, that's

7    12:00 p.m. on Friday, March 8, 2024, which is 60 days from

8    today's date.

9           If no designation is indicated by March 1st,

10   which is one week before the self-surrender date,

11   Mr.~Deutsch is instructed to contact the United States

12   Marshal Service to arrange for his self-surrender.

13          Again, all conditions of bond and release remain

14   in effect until the defendant is in the custody of the

15   Federal Bureau of Prisons.

16          Anything further from either lawyer at this

17   time?

18          MR. VARTAN:  Your Honor, I would ask that the

19   Court make a recommendation to Bureau of Prisons of

20   Otisville for Mr.~Deutsch.

21          THE COURT:  Do you wish to place on the record

22   any reason why?

23          MR. VARTAN:  No, just that is a facility that

24   would be proximate to his home.

25          THE COURT:  Thank you.  Does the government want

1    to be heard?

2              MS. GRUBER:  Not as to that issue.  I just want

3    to note the government will be filing a motion for

4    restitution for the little amount of restitution for

5    another lender that is remaining.

6              THE COURT:  Thank you.

7              MS. GRUBER:  Thank you, Your Honor.

8              THE COURT:  With respect to the request,

9    Mr.~Deutsch, the Bureau of Prisons has a discretion to

10   decide where to house you, however, the Court will for the

11   reasons requested by the defense recommend that you be

12   designated to Otisville.  Again, that's subject to the

13   assessments that the Bureau of Prisons will conduct.

14             MR. VARTAN:  Your Honor, I was also told that

15   was one of the few facilities in the area that offers

16   kosher meals, which is an additional for the

17   recommendation.

18             THE COURT:  The Court notes that as well.

19             MR. VARTAN:  Thank you, Your Honor.

20             PROBATION OFFICER:  With respect to the fine, is

21   there a schedule, like 10 percent?  Like a monthly

22   schedule?

23             THE COURT:  Do the parties want to be heard on

24   that?

25             MS. GRUBER:  Your Honor, he should be able to

1    pay it now.  But I've seen in conditions of release there

2    can be a payment schedule of time.

3              MR. VARTAN:  We would ask for a payment

4    schedule, and certainly endeavor to pay it sooner, but ask

5    that a payment schedule be imposed.

6              THE COURT:  Do the parties wish to docket

7    anything specific on that or make a request today?

8              PROBATION OFFICER:  Typical language is

9    10 percent of monthly income, whatever it may be.

10             MR. VARTAN:  I would just ask for if I could

11   have an opportunity to speak with the government and

12   probation and come back to the Court with a

13   recommendation.

14             PROBATION OFFICER:  No objection.

15             THE COURT:  So a payment schedule will be

16   ordered.  Any issue with that?  The parties can docket

17   something with your requests and I'll rule on that on the

18   papers.

19             MR. VARTAN:  Thank you, Your Honor.

20             MS. GRUBER:  Thank you, Your Honor.

21             THE COURT:  Anything further from either party

22   or probation or anybody?

23             I know that the matter of Aron Deutsch was

24   supposed to begin in about three minutes.  I'll certainly

25   give the parties and Court employees ample time as needed,

1    so I'll say when I take a recess it will be at least until

2    2:30, and I'll wait to hear from Madam Courtroom Deputy as

3    to when folks are ready.

4         If the parties need additional time, that's

5    fine.  Just let the Court know and that can be

6    communicated through Madam Courtroom Deputy.  So the Court

7    stands in recess until at least 2:30.

8         Mr.~Deutsch, make good decisions.

9         COURTROOM DEPUTY:  The United States District

10   Court is now in recess.

11

12

13                    C E R T I F I C A T E

14

15        I, Catherine Cullen, Official Court Reporter for

16   the United States District Court for the District of

17   Connecticut, do hereby certify that the foregoing pages

18   are a true and accurate transcription of my shorthand

19   notes taken in the aforementioned matter to the best of my

20   skill and ability.

21

22                         /S/ CATHERINE CULLEN

23                         _____
                           Catherine Cullen
                           Official Court Reporter
24                         450 Main Street
                           Hartford, CT  06103
25                         (914) 552-3201